**Walter ARMSTRONG, Plaintiff–Appellant,**

v.

**Joseph SQUADRITO, Allen County sheriff; Henry E. Dill, Allen County jail administrator/ commander; Daniel Reid, Richard Loscomb, and Michael S. Tate, jail confinement officers, Defendants–Appellees.**

No. 97–2569.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1998.

Decided July 24, 1998.

Joseph A. Christoff, Christoff & Christoff, Fort Wayne, IN, Dennis H. Geisleman (argued), Myers & Geisleman, Fort Wayne, IN, for Plaintiff–Appellant.

John O. Feighner, George Sistevaris (argued), Haller & Colvin, Fort Wayne, IN, for Defendants–Appellees.

Before CUMMINGS, BAUER, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Sixty-two-year-old Walter Armstrong voluntarily turned himself in at the Allen County (Indiana) lockup facility after he learned that a "body attachment warrant" had been issued for his arrest. The warrant was issued because Armstrong failed to appear in court for a hearing regarding child support arrearages. Armstrong thought, with good reason, that he would be in custody for a few hours, but his estimate turned out to be over a thousand hours short of the mark. As it turned out, the sheriff's office misfiled his records and held him for 57 days despite his repeated inquiries. Unsurprisingly, Armstrong brought a 42 U.S.C. § 1983 suit against the sheriff, the jail commander, and several guards. In granting summary judgment for the defendants, the district court explained how each person at the sheriff's department avoided responsibility for the egregious harm inflicted on Armstrong. Because we conclude that the defendants' conduct shocks the conscience, we reverse and remand.

This bizarre tale began on August 17, 1994, when the Allen County circuit court issued a "body attachment warrant" for the arrest of Walter Armstrong. Apparently Armstrong had failed to appear for a contempt hearing regarding child support arrearages. *See Armstrong v. Armstrong,* No. CC–87–1271 (an Allen circuit court continuing post-dissolution proceeding). Armstrong explains that he did not know of this hearing because, as the record indicates, his attorney withdrew from the case in the months beforehand. In any event, the Indiana Code directs that a sheriff executing a writ of attachment for contempt "shall *immediately:* (1) serve the writ; and (2) take the person into custody" and *"immediately* . . . take the person before the court which issued the writ." Ind. Code § 34–4–9–2.1(c)–(d) (1997) (emphasis added) (amended and recodified at Ind. Code § 34–47 by Ind. Pub.L. 1–1998). The specific warrant in this case read: "TO THE SHERIFF OF ALLEN COUNTY: You are hereby commanded to attach Walter Alfred Armstrong . . . and he safely keep, so that you have his body before the Judge of the Allen Circuit Court of Allen County, Indiana, FORTHWITH, to answer a contempt in not obeying the order of this Court as commanded at the 1994 Term of said Court."

On a Friday (August 26), just over a week after the Allen circuit court issued the warrant, officers arrived at Armstrong's home in Fort Wayne to execute the writ. Following the circuit court's policy, the officers proposed that Armstrong voluntarily surrender on Monday (August 29) to avoid a "weekend stay" at the Allen County lockup. Armstrong agreed to the deal and the officers explained the procedure: Following a brief detention at the lockup, sheriff's department personnel would escort Armstrong to court. Failing that, lockup officials would obtain a court date for Armstrong and release him that same day.

August 29 arrived and Armstrong reported to the lockup as promised. Sheriff's department officers at the Allen County Confinement Center properly processed Armstrong and placed him on a "will call" list of detain-

ees awaiting transportation to court. The lockup then contacted the sheriff's department warrants division. The warrants division telephoned the Allen circuit court to provide the case number as notice that the sheriff's department had Armstrong in detention. Armstrong then began to wait for the court to call him to appear before a judge—but the call never came.

Unfortunately for Armstrong, someone at the warrants division had transposed his case number before providing it to the court: CC–87–1271 became CC–87–1217. Apparently the Allen circuit court referred to detainees only by number and not by name. Because of the error, the court had no idea that Armstrong sat in jail awaiting an appearance. After two days, officers moved Armstrong from the lockup to the Allen County jail. Armstrong waited and waited and waited. Fifty-seven days passed.

During the first two days Armstrong apparently sat tight. As an explanation for his silence, Armstrong says that the officers told him that the court would call for him when it was ready. During the first week of his confinement Armstrong began to ask his jailers when they would take him to court. The officers answered that his name appeared on the "will call" list and that the judge would get around to him. With admirable faith in authority, Armstrong accepted this explanation and expected the court to call every day. As Armstrong waited longer and longer, he began to inquire about his predicament with greater insistence. He repeatedly asked every guard who would listen, "When am I going to go to court?" They kept replying, "When the judge calls you." The guards, and inmates, told Armstrong that it was normal procedure for a detainee to wait 60 or 90 days on the will call list—"It was nothing out of the ordinary."

David Nahrwold, a fellow inmate for 30 days, stated that Armstrong made almost daily complaints to jail officers about why he had no court date. Nahrwold described Armstrong's queries as "protests" and explained that confinement officers reprimanded Armstrong for his tone of voice. On one occasion, according to Nahrwold, Armstrong even "went so far as to step across the yellow line when inquiring as to why he was not being released." While the guards rebuked Armstrong for his complaints, they apparently did respond to Armstrong's inquiries by checking the will call list on a computer "downstairs." Each time they checked, they told Armstrong that the computer showed no court date or release date.

On four or five occasions Armstrong filled out a written "Inmate Request Form" and presented it to the guards. Armstrong asked when he would go to court. The officers told Armstrong again and again that there was no sense in turning in the written complaint. They could just go downstairs and check the computer instead of making Armstrong wait for two or three days while jail officials processed the request. Crucially, the guards actually refused to accept the form. So, after repeatedly hearing that the court had not yet set a date, Armstrong just threw away the written forms because, as he said abjectly, "I got the information I wanted."

Early in his confinement Armstrong called his boss, Ron Heathman, to say that it didn't look like he would make it back to work that week. Heathman came down to the jail to pick up warehouse keys from Armstrong. Six times over the course of Armstrong's detention, Heathman provided Armstrong with $10 in spending money. Armstrong explained that Heathman "was the only one around that I could . . . call." He had no relatives or friends in town. He did not have the phone number for his domestic relations attorney and the attorney did not accept collect calls. In any event, he didn't try to contact an attorney because he expected to be released every day. Eventually (and remarkably), Heathman, who needed Armstrong back at work, hired an attorney, who quickly gained Armstrong's release.

While the record contains a paucity of information about Armstrong's child support proceedings, it appears that the attorney won Armstrong's release by obtaining, on October 25, 1994, a child support order from the Allen circuit court. This order directed the sheriff to release Armstrong and required Armstrong to pay $57 per week in child support and $8 per week in arrearages. In addition,

the court set a status hearing on Armstrong's payment of support for December of 1994. After the entry of the order, Armstrong finally left the Allen County jail.

The defendants emphasize that Armstrong never protested his confinement by doing anything other than asking when he was going to court. According to the defendants, Armstrong never said the magic words: "Armstrong merely had to alert the Jail Officers that his incarceration should not have lasted more than a single day and for reasons unknown to him, he had been retained longer than that day." Regarding Armstrong's attempt to file written complaints, the defendants attempt to put a powerful spin on the facts by explaining that "[a]pparently the answers Armstrong received from the confinement officers satisfied him because he never submitted a formal written request to any supervisor or commander." In other words, Armstrong did nothing during his confinement to alert the defendants to his plight. Finally, in their efforts to place the blame on Armstrong, the defendants point to his state of mind. They suggest Armstrong acquiesced in his treatment because, with the knowledge that some inmates waited 60 days or more, he threw away the written request forms. "Armstrong accepted the status quo because he thought it was 'normal procedure' that he be incarcerated for so long a period of time. This presumption on the part of Armstrong frustrated the process of his timely release."

After getting out of jail, Armstrong filed a § 1983 suit naming the Allen County sheriff (Joseph Squadrito), the Allen County jail commander (Henry Dill), and the three Allen County confinement officers he could identify from photographs (Daniel Reid, Richard Loscomb, and Michael Tate). Armstrong directed his protests to these three guards when they covered his cell block. Jail records reveal that Reid served as Armstrong's confinement officer on 6 dates, Loscomb on 13 dates, and Tate on 6 dates. While Armstrong's complaint seems to name Squadrito and Dill only in their official capacities, it explicitly names the three guards in both their individual and official capacities. Armstrong alleged violations of his Fourth,

Eighth, and Fourteenth Amendment rights. In addition to his federal law claims, Armstrong brought supplemental state tort claims. Judge Lee in the district court disposed of Armstrong's case by granting summary judgment for the defendants on June 4, 1997. The judge explained that Armstrong could not prove his case under § 1983 and, in any event, the defendants deserved qualified immunity. Having thus disposed of Armstrong's federal claims, Judge Lee opted not to exercise jurisdiction over the state law claims. Today we consider Armstrong's appeal.

Our analysis begins and ends with one question: Did the defendants' 57–day detention of Walter Armstrong offend substantive due process? Before answering that question, however, we need to explain why this case plays out on the yielding natural grass of substantive due process rather than the stiff astroturf of specific constitutional rights. This issue deserves particular attention because, as the Supreme Court recently emphasized, "we have 'always been reluctant to expand the concept of substantive due process.'" *County of Sacramento v. Lewis*, —— U.S. ——, ——, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Court underscored its reluctance to extend substantive due process by explaining that "[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (internal quotation marks omitted).

■■■ Armstrong's Fourth Amendment claim drops out of the case because that amendment "governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause." *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir.1992). Because Armstrong's ar-

rest took place pursuant to a bench warrant, this case concerns detention following a judicial determination of sufficient cause. Similarly, Armstrong's Eighth Amendment claim falls away because that amendment applies only to a convicted prisoner rather than a pretrial detainee whose rights receive the protection of due process. *See Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Duran v. Elrod*, 542 F.2d 998, 999–1000 (7th Cir.1976). Because Armstrong's detention occurred before the Allen circuit court even considered whether to sanction him for contempt, we do not reach the question of whether imprisonment for contempt in Indiana invokes the Eighth Amendment. Thus, Armstrong either sinks or swims based on the success of his § 1983 claim under the Fourteenth Amendment's Due Process Clause where the question is whether an executive abuse of power shocks the conscience. *See County of Sacramento*, — U.S. at —, 118 S.Ct. at 1717 (citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and its progeny).[1]

■ In order to survive summary judgment on a § 1983 claim, Armstrong must present facts to establish that the defendants intentionally or recklessly deprived him of a constitutional right. (Of course, Armstrong must also show that the defendants acted under color of state law and that their actions constituted the legal cause of Armstrong's damages, but the defendants do not appear to contest Armstrong's proof on these elements.) This inquiry involves two separate questions: (1) Did the defendants violate a constitutional right? and (2) Did the defendants act with sufficient culpability?

Unfortunately, this orderly approach deteriorates when the constitutional right exists, if at all, as a matter of substantive due process. Such cases become muddled because any inquiry into substantive due process invokes a " 'less rigid and more fluid' " inquiry than "envisaged in other specific and

particular provisions of the Bill of Rights." *County of Sacramento*, — U.S. at —, 118 S.Ct. at 1719 (quoting *Betts v. Brady*, 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942)). In other words, an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements: "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in light of other considerations, fall short of such denial." *Id.* (quoting *Betts*, 316 U.S. at 462, 62 S.Ct. 1252).

Does the totality of the circumstances approach mean that we do not inquire separately into the existence of a right and the culpability of the defendants' conduct? On the contrary, the most recent teaching from the Supreme Court suggests that we should still examine these two issues as crucial considerations in our totality calculus. For instance, the *County of Sacramento* majority established the appropriate standard of conduct necessary to establish a violation of substantive due process in a § 1983 suit brought following a fatality occurring during a police pursuit. *See id.* 118 S.Ct. at 1720. Meanwhile, the *County of Sacramento* majority and dissent argued over the appropriate method for establishing the validity of the alleged constitutional right. *Compare id.* at 1717 n. 8 *with id.* at 1723 (Scalia, J., dissenting). Accordingly, we will organize our thoughts as follows: First, we examine whether the Due Process Clause protects against an extended detention, without an appearance before a magistrate, following an arrest pursuant to valid bodily attachment. Second, we will explore whether the defendants' conduct offended the standards of substantive due process. And third, we will consider whether the totality of the circumstances shocks the conscience.

■ Before turning to our first concern—the existence of a right protected by the

---

1. We read *County of Sacramento* to allow substantive due process claims for damages under § 1983. *See County of Sacramento*, — U.S. at —, 118 S.Ct. at 1713 (citing *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), for the proposition that "substantive due process violations are actionable under § 1983"). *But see Riley v. Camp*, 130 F.3d 958,

964 & n. 10 (11th Cir.1997) (explaining the Eleventh Circuit's position that "the *Rochin* standard has no place in a civil case for money damages," *McKinney v. Pate*, 20 F.3d 1550, 1556 n. 7 (11th Cir.1994) (en banc), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995)), *cert. denied*, — U.S. —, 118 S.Ct. 2296, 141 L.Ed.2d 157 (1998).

Constitution-we hasten to add that our use of the word "right" is for heuristic purposes only. In strict terms, executive conduct does not violate substantive due process—it does not shock the conscience—unless it meets all three of the conditions we have identified. What we refer to as a "right" is often referred to as a "protected interest." *See, e.g., West v. Waymire,* 114 F.3d 646, 652 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 337, 139 L.Ed.2d 261 (1997). Other courts address this element under the rubric of "constitutional injury." *See, e.g., Vasquez v. Hernandez,* 60 F.3d 325, 326 (7th Cir.1995), *cert. denied,* 517 U.S. 1156, 116 S.Ct. 1545, 134 L.Ed.2d 648 (1996). Whatever terminology we adopt, we note that because this inquiry defines the scope of constitutional protections, it is a question of law, not one of fact.

In *County of Sacramento* the Court engaged in vigorous debate over how to determine whether substantive due process confers a particular right. The dissent believed that this inquiry should describe the asserted right carefully and then attempt to locate the alleged liberty interest among those fundamental rights objectively deeply rooted in our traditions and implicit in the concept of ordered liberty. *See id.* at ——, 118 S.Ct. at 1723 (Scalia, J., dissenting). Because, as Justice Scalia noted, the Court took this approach in *Washington v. Glucksberg,* —— U.S. ——, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), we are mindful of its importance. We will not, however, rigidly adhere to a historical approach because, as the majority explained, our analysis of executive action depends on whether it shocks the "contemporary conscience." *Id.* at —— n. 8, 118 S.Ct. at 1717 n. 8. Furthermore, in concurrence, Justice Kennedy explained that the crucial concern is to avoid "subjective assessments" and to assess the "objective character" of conduct in terms of traditions, precedents, and the contemporary needs of executive officials. See *id.* at ——, 118 S.Ct. at 1722 (Kennedy, J., concurring). Given the divergence of authority on this issue, we will attempt to strike a middle ground by following Justice Kennedy's schema.

Accordingly, we begin our examination of Armstrong's Fourteenth Amendment claim by asking: Does the Due Process Clause guard against the extended detention, without an appearance before a magistrate, of a civil arrestee who complains about his confinement following a valid arrest pursuant to a body attachment warrant? In *Coleman v. Frantz,* 754 F.2d 719 (7th Cir.1985), this circuit approached the same problem in the context of a criminal arrest warrant and found a due process right protecting against prolonged confinement. *Coleman,* therefore, will be our guiding light for much of this opinion. The *Coleman* court analyzed the question, much as Justice Kennedy suggests, by examining precedent, long-standing state and federal statutes, and specific textual rights. Because of the intense debate over the existence of substantive due process rights, we will focus considerable attention on the genesis of this right in *Coleman* and its application to Armstrong's case.

*Coleman* involved the sheriff of Wells County, Indiana, who arrested Meredith Coleman pursuant to a criminal bench warrant on a charge of receiving stolen property. The sheriff returned the warrant to the court and began to detain Coleman, who protested his innocence and repeatedly asked when he would go to court. In response, the sheriff repeatedly called the prosecutor's office to arrange for Coleman's "first appearance." While the sheriff awaited an answer from the prosecutor he continued to hold Coleman. After 18 days the prosecutor told the sheriff to release Coleman. Eventually the prosecutor dismissed the charges. While the *Coleman* court found that the sheriff's conduct offended substantive due process, the court held that the sheriff enjoyed the protection of qualified immunity because he reasonably attempted to fulfill his duties and because he did not violate a "clearly established" right.

In examining the parameters of the Due Process Clause, *Coleman* began with *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), even though that case dealt with the constitutionality of extended detention following an arrest without a prior judicial determination of probable cause. As *Coleman* explained, the *Gerstein* Court pro-

vided the foundation for any examination of protracted pretrial detentions by detailing the "high stakes" of extended confinement: "The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Gerstein*, 420 U.S. at 114, 95 S.Ct. 854. While this language in *Gerstein* helps to establish the depth of constitutional concern for protracted detention, the decision admittedly applies only to arrests without a warrant.

Next, *Coleman* looked at *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), in which the Court held that a 3-day detention following a mistaken arrest pursuant to a valid criminal warrant did not violate due process. Crucially, however, the *Baker* Court explained that the Due Process Clause could guard against an extended detention:

> Obviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. For the Constitution likewise guarantees an accused the right to a speedy trial, and invocation of the speedy trial right need not await indictment or other formal charge; arrest pursuant to probable cause is itself sufficient. We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty ... without due process of law."

*Id.* at 144–45, 99 S.Ct. 2689 (citation omitted). While *Baker* rejected constitutional liability for a 3–day detention, the *Coleman* court explained that Sheriff Baker could have prevented that detention only "by the institution of significant and burdensome investigative procedures." *Coleman*, 754 F.2d at 724. Thus, *Coleman* understood *Baker's* analysis to hinge on "the duration of the detention

and the burden placed on state officials in providing procedural safeguards." *Id.* Based on *Baker*, the *Coleman* court reasoned that when a state provides for a first appearance, it would place a small burden on the state to ensure the timeliness of that appearance. Accordingly, the *Coleman* panel found that the Wells County officials' failure to secure a first appearance for Meredith Coleman constituted a "disturbing and unexplained" act violating substantive due process. *Id.* This conclusion arose out of the court's understanding of the important constitutional role of longstanding state and federal statutes providing for a first appearance.

In order to explicate the constitutional dimensions of the first appearance, the *Coleman* court explained the customary elements of the procedure: Most states require a "prompt" first appearance. A few impose a specific time limit, but most merely call for an appearance "without unnecessary delay" or "forthwith." In general terms, the first appearance marks the formal beginning of the criminal prosecution at which a judge or magistrate makes sure that the defendant is the person named in the complaint and that the defendant knows the charges contained in the complaint. In addition, the judge informs the defendant of his right to counsel and, if the defendant is indigent, of the right to appointed counsel. Finally, the court sets bail. *See id.* at 722 n. 1. Building on this "listing of traditional components of a first appearance," *id.* at 724, *Coleman* then demonstrated that each aspect of the first appearance achieves a constitutional purpose.

> Almost every element of a "first appearance" under state statutes or the Federal Rules of Criminal Procedure serves to enforce or give meaning to important individual rights that are either expressly granted in the Constitution or are set forth in Supreme Court precedent .... (1) inform the suspect of the charge—Sixth Amendment ("the accused shall enjoy the right * * * to be informed of the nature and the cause of the accusation"); (2) inform the defendant of the right to counsel and determine if the defendant is indigent and desires the assistance of appointed counsel—Sixth Amendment ("the accused shall

enjoy the right * * * to have the Assistance of Counsel for his defence"); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387; (3) inform the suspect of the right to remain silent under the privilege against self-incrimination—Fifth Amendment ("No person * * * shall be compelled in any criminal case to be a witness against himself"); *Miranda v. Arizona, supra;* (4) set or review bail—Eighth Amendment ("Excessive bail shall not be required"), *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3.

*Id.* (parallel citations omitted). Because many of these rights involve the delivery of information-information that allows an arrestee to take appropriate legal action—a first appearance amounts to the established procedure that ensures an arrestee receives this information from a neutral source. As *Coleman* noted, an extended detention without a first appearance "substantially impinges upon and threatens all of these rights." While the *Coleman* court recognized that the absence of a first appearance may not necessarily cause "a specific violation of any one of these rights," the court found that the "ultimate effect of the omission ... must be deemed a denial of due process." *Id.* The first appearance has such great value in protecting numerous rights that its denial presumptively disrupts those rights. Therefore, as a matter of constitutional prophylaxis, the denial of a first appearance offends the Due Process Clause.

*Coleman* does not stand alone in stating that a prolonged detention implicates a protected interest under substantive due process. In *Patton v. Przybylski,* 822 F.2d 697 (7th Cir.1987), the court stated that an arrest on a warrant, over protests of innocence, followed by a week-long detention without investigation or an appearance before a magistrate, would make out a claim "under the due process clause if the arrest was proper and the complaint is that the arrested person, having been deprived of his liberty by

being incarcerated, was denied due process." *Id.* at 701. Similarly, in *Brown v. Patterson,* 823 F.2d 167 (7th Cir.1987), the court explained that "a prolonged confinement of an arrested person without a hearing to determine whether he is the person named in the warrant would be a deprivation of liberty without due process of law and thus violate the Fourteenth Amendment." *Id.* at 169. Writing separately, Judge Cudahy argued the same point in *Garcia v. City of Chicago,* 24 F.3d 966 (7th Cir.1994) (Cudahy, J., concurring in part and dissenting in part), where he explained his concern that a finding of probable cause did not "bestow[ ] a constitutional blessing on *all* subsequent prolonged detention." *Id.* at 972–74. *See also Johnson v. City of Chicago,* 711 F.Supp. 1465, 1470 (N.D.Ill.1989) ("a prolonged detention, coupled with the failure to investigate a claim of mistaken identification, may suggest a deprivation of liberty without due process").

These cases strengthen the argument that prolonged detention offends due process. Problematically, however, *Coleman* and the other decisions all deal with a slightly different situation from the one confronting us in this case. In *Coleman* and the rest, the plaintiffs all faced arrest and detention for criminal charges. In this case, the Allen County sheriff held Armstrong on a civil warrant. We need to examine whether this difference alters the equation.

■ First of all, Indiana law provides that a bodily attachment warrant constitutes a civil warrant rather than a criminal warrant. *See Casselman v. State,* 472 N.E.2d 1310, 1312 & n. 3 (Ind.Ct.App.1985). Therefore, arguably, the logic of *Coleman* loses its force because a civil arrest evokes none of the specific constitutional rights that *Coleman* found crucial in determining that the denial of a first appearance abridged due process. To analyze this argument we need to delve into Indiana's procedures for body attachment warrants.

Apparently the Allen circuit court issued the writ of attachment because Armstrong failed to appear at a hearing. This would seem to invoke Indiana's indirect contempt statutes. The contempt statutes state that "every person guilty of any wilful disobedi-

ence of any process ... shall be guilty of an indirect contempt." Ind.Code § 34–4–7–3.[2] Crucially, the indirect contempt rules explain that the court must charge a person with contempt by issuing a rule that

> shall clearly and distinctly set forth the facts which are alleged to constitute such contempt ... as to inform the defendant with the nature and circumstances of the charge against him; and shall specify a time and place at which he is required to show cause, in said court, why he should not be attached and punished, which time the court shall, on proper showing, extend so as to give the defendant a reasonable time and just opportunity to purge himself of such contempt.

Ind.Code § 34–4–7–8. The statutes further provide that "[i]f the defendant shall fail to appear in said court, at the time and place specified in the rule ... the court may proceed at once, and without further delay, to attach and punish him or her for such contempt." But the Indiana Supreme Court has explained that even when the court charges a defendant with failure to appear under a rule, the court must issue a second rule giving the defendant notice of the charge and time to answer—or purge himself of the contempt—before proceeding to punish the defendant. *See Levick v. State,* 224 Ind. 561, 69 N.E.2d 597, 597 (1946) ("It is a fundamental right of due process that one who is subject to punishment be informed of the charge and be given time to answer.").

When a court reaches the proper point for issuing a writ of attachment, "the court may issue a writ of attachment of the body of the person" allegedly in contempt of court. Ind. Code § 34–4–9–2.1(b). The writ shall "fix an amount of ... bail ... or ... escrow, if the order that the person has allegedly violated concerns a child support obligation." Ind.

Code § 34–4–9–2.1(b). The statute provides for the release of the person upon the proper deposit of bail or appropriate escrow. Ind. Code § 34–4–9–2.1(d)–(f).[3] The writ shall direct that the sheriff "shall immediately: (1) serve the writ; and (2) take the person into custody" and "immediately ... take the person before the court which issued the writ." Ind.Code § 34–4–9–2.1(c)–(d). Once before the court, either to answer a rule or after arrest on a writ of attachment, the defendant has the opportunity to either refute or explain the facts contained in the rule "so as to show that no contempt was intended," in which case "the court shall acquit and discharge the defendant." Ind.Code § 34–4–7–9. If the defendant cannot "sufficiently deny, explain or avoid the facts," then the court may "punish him for such contempt, by fine, or imprisonment, or both," and the defendant may then appeal. Ind.Code § 34–4–7–9.

Returning now to the question of whether Armstrong's arrest under a civil warrant removes this case from the ambit of *Coleman.* As we noted, a body attachment writ for contempt constitutes a civil warrant. On the other hand, the Indiana courts have said that the body attachment warrant shares certain attributes with its criminal cousin-for instance, a civil warrant, like a criminal warrant, "authorizes the sheriff to take a person into custody and provides for bail." *Casselman,* 472 N.E.2d at 1312 n. 3. In addition to these shared characteristics, several other considerations make us realize that the ostensibly clear demarcation line between Armstrong's civil arrest warrant and a criminal warrant is, instead, a far more imprecise boundary. For instance, Indiana's indirect contempt statutes repeatedly refer to determinations of "guilt" for contempt. The laws refer to an alleged contemnor as a "defendant." The statutes mention that the court

---

**2.** The following citations to contempt statutes refer to the laws in effect at the time of Armstrong's arrest and detention. Indiana recently amended and recodified these sections. *See* Ind. Pub.L. 1–1998 (amending and recodifying the contempt statutes at Ind.Code § 34–4–7).

**3.** We find it disturbing that the writ used to arrest Armstrong made no mention of bail or escrow as required by the statute. *See* Ind.Code § 34–4–9–2.1(b)(2). Perhaps our concern on this

point arises because of our distance from the facts. Or, perhaps, our uncertainty simply stems from the lack of information in the record about the child support proceedings. Therefore, since we lack the benefit of any briefing on the underlying facts and on the fine points of Indiana law, we will not write further on this tangent. We have no doubt that the parties and district court can address this matter if necessary.

can "acquit" the alleged contemnor. The requirements and purposes for the rule to show cause closely resemble a criminal indictment. The contempt laws allow the court to "punish" the contemnor. All of these admittedly superficial, and mainly semantic, particulars make Armstrong's case appear closer to a criminal prosecution than it might seem at first blush.

Not only does the contempt statute contain the language of criminal law, the Indiana courts have interpreted the law to provide the sort of due process protections normally associated with a criminal proceeding. This principle is most powerfully stated in *Mitchell v. Stevenson*, 677 N.E.2d 551 (Ind.Ct. App.), *transfer denied*, 683 N.E.2d 594 (Ind. 1997), where the court explained that: "The disobedience of a court order may be categorized as either civil contempt or criminal contempt. Whether the conduct is categorized as civil contempt or criminal, the trial court must still provide the defendant the same statutorily prescribed due process protections." *Id.* at 560 (citations omitted). In other words, as far as the Indiana courts are concerned, Armstrong was due the same process regardless of whether the sheriff arrested him under a warrant for criminal or civil contempt. In *Showalter v. Brubaker*, 650 N.E.2d 693 (Ind.Ct.App.1995), the court made a similar point by explaining that: "In cases of both civil and criminal contempt, the trial court is required to give the contemnor notice which allows adequate time to prepare a defense. Failure to give such notice results in prejudice to the defendant." *Id.* at 701 (citations omitted).

We do not labor under the misimpression that the processes accorded by Indiana's statutes and courts create a substantive due process right under the Fourteenth Amendment. *See Villanova v. Abrams*, 972 F.2d 792, 798 (7th Cir.1992) (describing "the persistent fallacy that procedural requirements create substantive entitlements").[4] Nevertheless, the Indiana courts' understanding of the procedures required in a contempt case is helpful to analyzing whether or not Armstrong's lack of a prompt appearance before the Allen circuit court offended federal due process. The *Coleman* court found a violation of substantive due process by examining the connection between a first appearance and the criminal provisions of the Bill of Rights. We have examined the procedural requirements related to a writ of attachment for contempt. The requirements for contempt are extensive and intimately concern such traditional due process concepts as notice and opportunity to be heard. The statutes give Armstrong the right to offer bail or escrow and earn his release. They give him the right to defend himself against the contempt charge. We are struck by the extent to which these rights parallel the protections accorded a criminal defendant. Most compellingly, however, the Indiana contempt statutes provide for fines and imprisonment. Thus, even if Armstrong cannot avail himself of the protections of the Fifth, Sixth, and Eighth Amendments to defend against a charge of civil contempt, he faces the same sort of ultimate sanction as if he defended himself from a criminal charge—the loss of liberty. This is atypical of a civil proceeding.

Furthermore, Armstrong protested the lack of a prompt appearance. We consider this an important factor because the Supreme Court conspicuously noted it in *Baker v. McCollan*. Even though Armstrong did not protest his innocence, he did complain. Because Armstrong is a layperson, he did not use the magic words of the law. Because Armstrong seems to be respectful of authority, he did not press the issue as forcefully as he, perhaps, should have. Nevertheless, we understand his protests as a demand for his rights. He did not acquiesce in his confinement. As the Supreme Court intimated in *Baker v. McCollan*, federal due process simply does not permit the state to detain an arrestee indefinitely without procedural protections. While the Constitution does not mandate the specific procedures accorded by Indiana, neither does it tolerate the absence, following arrest, of any procedure whatsoev-

---

4. For this reason we do not endorse the approach taken in *Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir.1992) (applying a *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), analysis to find a violation of federal procedural due process based on a state's violation of its own procedural statutes).

er. Therefore, we believe Armstrong's case falls under *Coleman*. After Armstrong's arrest on a writ of body attachment, the denial of an appearance before the Allen circuit court, despite Armstrong's protests, abridged Armstrong's substantive due process rights.

We reach the same conclusion by following another line of reasoning. A writ of attachment issued in conjunction with a contempt hearing utterly fails to justify a prolonged detention. Such a writ constitutes only the authority to seize a person and bring that person before the court. It does not represent even the first quantum of proof toward a sanction of any kind, much less imprisonment. A writ of attachment represents the authority to "immediately . . . take the person before the court." Ind.Code § 34–4–9–2.1(d). Thus, when the Allen circuit court directed that the sheriff arrest Armstrong, it had determined that he failed to appear but had not yet made any finding regarding his culpability for contempt. Only by bringing Armstrong before the court to answer a formal charge of contempt could the court imprison Armstrong.

In contrast, a criminal arrest warrant issues after a threshold showing of probable cause—some proof on the ultimate issue. The finding of probable cause alone justifies detention if a defendant cannot make bail. Theoretically, if a criminal warrant issued on proof beyond a reasonable doubt (which would seem an impossibility in an ex parte proceeding), then long-term detention based on such a warrant would offend a host of our procedural rights but it might not shock the conscience. Phrased another way, the criminal arrest warrant conceivably could justify protracted detention if it possessed a sufficient *quantity* of evidence.

The writ of attachment for failure to appear-regardless of the amount of evidence supporting its issuance—could never justify detention because it possesses an entirely different *kind* of evidence. Thus, the sheriff of Allen County arrested Armstrong with the exceedingly limited authority to bring him before the Allen circuit court. Without any finding of culpability the municipal authorities possessed no power to detain Armstrong, nor could they point to any public interest in his detention. Given these facts, the detention of Armstrong for anything more than a brief time preceding his appearance in court represents an affront to substantive due process.

At long last, then, we turn to the next step in our analysis: Did the defendants' conduct offend the standards of substantive due process? Initially we need to identify the applicable standard of conduct. Because this case falls under substantive due process, it might seem that the appropriate standard is conduct that shocks the conscience. The Supreme Court described this kind of conduct as behavior at the far "end of the culpability spectrum." *County of Sacramento*, —— U.S. at ——, 118 S.Ct. at 1718. Crucially, however, the Court explained that less horrible conduct also violates substantive due process:

> Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness, or gross negligence, is a matter for closer calls. To be sure, we have expressly recognized the possibility that some official acts in this range may be actionable under the Fourteenth Amendment, and our cases have compelled recognition that such conduct is egregious enough to state a substantive due process claim in at least one instance.

*Id.* (citations and internal quotation marks omitted). Specifically, the Court endorsed the use of the deliberately indifferent standard for cases in which the defendants have the luxury of forethought: "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical. . . ." *Id.* at ——, 118 S.Ct. at 1719. The Court explained that prison is the quintessential setting for the deliberately indifferent standard because "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory. . . ." *Id.* Elaborating on this theme, the Court stated that "liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judg-

ments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at ——, 118 S.Ct. at 1720. If any doubt remained about whether deliberate indifference could shock the conscience, the Court summed up with: "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.*

What, then, constitutes deliberate indifference? Under the Eighth Amendment, deliberate indifference amounts to criminal recklessness—the defendant must have known that the plaintiff "was at serious risk of being harmed, [and] decided not to do anything to prevent that harm from occurring even though he could easily have done so." *West v. Waymire*, 114 F.3d 646, 651 (7th Cir.) (Posner, C.J.) (citing *Farmer v. Brennan*, 511 U.S. 825, 836–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)), *cert. denied*, —— U.S. ——, 118 S.Ct. 337, 139 L.Ed.2d 261 (1997). Under other constitutional provisions, however, the standard for deliberate indifference appears closer to tort recklessness. As our Chief Judge Posner explained: "The picture is less clear with regard to infringements of other constitutional rights and with regard to municipal liability for infringements of such rights generally." *Id.* Accordingly, because this case falls under the Fourteenth rather than the Eighth Amendment, we will define deliberate indifference as "conscious disregard of known or obvious dangers." *Id.* (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997)). Fleshing out this definition, Chief Judge Posner stated that "a deliberate choice to avoid an obvious danger (or 'plainly obvious,' as the Court put it, no doubt for emphasis) is actionable under 42 U.S.C. § 1983 if the choice results in harm to a protected interest, even though the defendant obtusely lacks actual knowledge of the danger." *Id.* (citation omitted).

As we read this case, Armstrong presents four separate claims of improper conduct. If Armstrong survives summary judgment on any of these claims, the question of whether the defendants' conduct constituted deliberate indifference is a classic issue for the fact finder. We know that the submission of the issue to the fact finder may create some confusion because, technically, the question is the second consideration in our inquiry into the existence of a violation of substantive due process. Nevertheless, because this question is a factual mainstay of actions under § 1983, we do not believe it should receive consideration as a question of law. Any concern about allowing the fact finder to determine a constitutional question is ameliorated by the overlap between this inquiry and the third step in our analysis— an examination of the totality of the circumstances—which is a question of law. Since we review the factual sufficiency of Armstrong's claims on summary judgment, however, we will apply the usual *de novo* standard. *See Harris v. City of Marion*, 79 F.3d 56, 58 (7th Cir.1996).

Armstrong's first argument is a municipal custom or policy claim (a *Monell* claim, *see Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and progeny) based on the "failure to select or implement necessary practices" resulting in a constitutional violation. *Harris*, 79 F.3d at 58. Armstrong pursues this claim by naming Sheriff Squadrito and jail commander Dill in their official capacities. We read this as a claim against the offices of sheriff and jailer rather than against the people serving in those roles—in other words, we understand such a claim as a suit against the municipality itself. *See Yeksigian v. Nappi*, 900 F.2d 101, 103 (7th Cir. 1990) (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67 & n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

Armstrong contends that the Allen County jail's "will call" policy is constitutionally inadequate because it displays indifference to the rights of those arrested with a civil warrant to a prompt appearance before a court. Armstrong makes out a close case. According to the deposition of Dill, the will call policy transmitted to the court the case numbers for several categories of arrestees, including those arrested for probation and parole violations, along with those arrested for failure to appear. Once the jail placed those

people on the will call list, it took no action other than waiting for word of a hearing date from the court. According to Dill, no one at the jail had the responsibility to ensure that detainees on the will call received an expeditious appearance. Furthermore, the jail had no procedures to determine when a detainee on the will call list had waited too long. Apparently, unless the jail checked each individual's file, the jail could not identify those detainees without court dates; nor could the jail distinguish between those people, like Armstrong, held under warrants that authorized only a very limited detention, and those people held under warrants that might allow a much longer detention. Finally, Dill explained that the jail did not consider itself responsible for getting someone like Armstrong to the court. In other words, the jail's policy was that once it placed a detainee's name on the will call list, the jail left the matter in the hands of the court.

The district court considered this policy and found that it did not violate the deliberate indifference standard because the sheriff's department had no knowledge that the policy posed a risk of a constitutional injury. The district court based its reasoning on *Harris v. City of Marion*, 79 F.3d 56 (7th Cir.1996). In *Harris* the court found that the warrant system of the Marion County jail failed because of an isolated incident of negligence—the only problem in 18 years. The *Harris* court explained that one negligent incident does not establish deliberate indifference in an otherwise good policy. *See id.* at 59. Because Armstrong admits that he presented no evidence of problematic detentions similar to his in Allen County, the district court found that the sheriff's department did not have the knowledge of a problem to form the basis of deliberate indifference. The district court attributed Armstrong's confinement to the unfortunate transposition of his case number—a merely negligent act.

Unfortunately, we cannot agree with the able district judge's view of Armstrong's claim and his reading of *Harris*. In *Harris* the court stated: "The Supreme Court in [*City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989),] distin-

guished between a city's deliberate or conscious choice" not to have a policy, "which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." *Harris*, 79 F.3d at 59. The *Harris* court explained that it faced the "second type of problem." *Id.* Here, however, Armstrong alleges the first type of problem. He presents facts establishing the failure to make policy in a situation that demands policy. He argues that the sheriff's will call policy represented a nonpolicy—a conscious choice not to have a policy. He does not complain about the transposition of his case number, he complains about the entire procedure. As such, the applicable law states that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir.1986) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Or, as we stated in *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.1986), "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." Since Armstrong admits that the Allen County officials possessed no actual knowledge of a problem with the policy, he must establish that the policy ignored a plainly obvious danger.

We think Armstrong comes very close to surviving summary judgment on this point. The several prolonged detention cases cited above establish a recurring danger. In *Coleman* we explained that the danger violated substantive due process. We must hold municipal officials responsible for knowing the law. While Armstrong's case may be an isolated incident in Allen County, it is hardly an isolated incident in the country. Prolonged detention after arrest with a warrant is not as common as the problem addressed in *Gerstein*, but it certainly seems to be a basic concern of jail administration. In a constitutional sense, how much more basic could it get—jails cannot confine people without the authority to do so. A policy that

ignores whether the jail has the authority for long-term confinement seems to be a policy of deliberate indifference. Furthermore, jailers hold not only the keys to the jail cell, but also the knowledge of who sits in the jail and for how long they have sat there. They are the ones directly depriving detainees of liberty. In Indiana, the sheriff's department (which administers the jail) is also the entity charged with taking those arrested on both civil warrants, *see* Ind.Code § 34–4–9–2.1(d), and criminal warrants, *see* Ind. Code §§ 35–33–2–2(a)(6) and 35–33–7–4, to court. The jail knew this and it knew that the detainees needed to appear before the court. Despite this knowledge, the jail promulgated a policy under which it abdicated responsibility. The jail acts at its own peril if it passes responsibility off on another party—whether the courts or the prosecutor. While the Constitution does not impose an affirmative duty on jail officials, it does hold them responsible when their failure to devise adequate policies results in an injury.

We certainly do not know as much about jail administration as the jailers themselves, but we see any number of simple backup plans that would alleviate the problem with Allen County's will call system. For example, the jail could have periodically printed out a roster of all those detained on the will call list along with the reason for their detention. A perusal of the roster would reveal whether the jail held any detainees for a period of time longer than its authority. While such a backup plan might not catch mistakes immediately, it would rectify the problems eventually and thus defeat any allegation of deliberate indifference. But here, Dill admitted that if Armstrong's attorney had not intervened, the jail would have taken no action at all. As Dill explained, "There was no process at that time to check on whether [Armstrong] was going to go to court or not, we left that—we left that entirely up to the courts to call for him."

In other words, the will call system in place at the time of Armstrong's arrest and detention (since then the jail has taken "subsequent remedial measures") seems to amount to a policy of deliberate indifference. But the jail had a backup plan—of sorts, at

least—it accepted formal written complaints from the detainees. The complaint form (euphemistically entitled an "Inmate Request Form") allowed the detainee to request information on either the "court date" or "release date." The complaint forms demonstrate an understanding on the jail's part that detainees need an avenue to address prolonged, improper confinement. In other words, the complaint forms show an awareness on the part of jail officials that a danger exists and an attempt to avert an injury from that danger. Seemingly, if Armstrong had filled out a complaint form the jail should have investigated his situation and released him. If it did not, then Armstrong's case for deliberate indifference would be infinitely stronger. In sum, we believe that this particular complaint procedure saved the will call system from being deliberately indifferent.

▮ Immediately upon considering the complaint forms, however, we reach Armstrong's second claim—another *Monell* claim brought against Squadrito, Dill, and the confinement officers in their official capacities. Again, we read this as a claim against the municipality, not the individuals. In this claim Armstrong presents facts establishing that the jail had either a policy or custom of refusing to accept complaint forms from detainees requesting information on their will call status. It remains unclear from the record whether the confinement officers refused Armstrong's written complaints about his status pursuant to an official policy that the guards should just check the will call list on the computer, or whether the confinement officers refused Armstrong's written complaints under a more informal custom of the jail. In either case, however, Armstrong satisfies the requirements of *Monell.*

Because the refusal to accept a complaint occurs only in the face of a detainee raising a concern regarding improper confinement, the policy/custom comes into play only in cases where the complaint itself announces a risk of a constitutional injury. The policy or custom, therefore, facially displays a conscious disregard of a known danger. Furthermore, the refusal to accept complaints vitiates the salutary effect of the complaint form and returns us to the serious problems evident in

the will call system. A policy of refusing to accept a complaint seems to us analogous to a policy of refusing to act upon a reasonable request for medical assistance. Therefore, Armstrong survives summary judgment on this claim.

■ Armstrong's third claim is an individual capacity claim against the confinement officers for their personal involvement in refusing his complaint forms and keeping him in detention. The district court granted summary judgment for the defendants on the grounds that Armstrong failed to establish that the guards "caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996), *cert. denied*, — U.S. — , 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). Again, we think Armstrong's argument has been misperceived. The district court explained that the guards took no part in the transposition of Armstrong's case number. Therefore, the court explained, they were not personally involved in the error that caused Armstrong's protracted confinement. But Armstrong does not contend that the guards should answer for the transposition of his number; instead he assails their conduct in not passing his written complaints to their superiors and in keeping him locked up. Clearly, the guards did personally participate in this conduct.

The district court explained further that the guards acted in good-faith reliance on the accuracy of the will call list. The court based this conclusion on *Wood v. Worachek*, 618 F.2d 1225 (7th Cir.1980), in which we stated that "a jailer is liable for the illegal detention of an inmate when he unreasonably detains the inmate for arraignment or release, or possesses an affirmative knowledge of the illegality of the arrest. But if the errors upon which liability is asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith." *Id.* at 1231. As the district judge explained: "In this case, the most that could be said about the actions of the confinement officers is that they were, *arguably*, remiss in not interpreting Armstrong's inquiries about a court date as actual protests about his incarceration that warranted further investigation." The

district court, like the defendants, seemingly wanted Armstrong to utter magic words. We will not look upon Armstrong's protests so parsimoniously. The district court might have it right, however, if Armstrong had protested only once or twice. In such circumstances, the guards' efforts in checking the will call list might absolve them of their refusal to accept Armstrong's written complaints. But Armstrong's repeated and increasingly strenuous complaints should have provided the guards with sufficient knowledge to suspect improper confinement and take additional action. Armstrong claims that, given this knowledge, their failure to transmit his complaints to the jail authorities constitutes deliberate indifference. This argument dovetails smoothly with the Supreme Court's emphasis on "unhurried judgments, upon the chance for repeated reflection." *County of Sacramento*, — U.S. at — , 118 S. Ct. at 1720.

By focusing on Armstrong's repeated protests we do not intend to convert a series of possibly negligent acts by the guards into deliberate indifference. As we explained in *Sellers v. Henman*, 41 F.3d 1100 (7th Cir. 1994): "[A] series of purely negligent acts [cannot] be equated to an act of deliberate indifference. . . . The only significance of multiple acts of negligence is that they may be evidence of the magnitude of the risk created by the defendants' conduct and the knowledge of the risk by the defendants." *Id.* at 1102–03. Accordingly, we think that Armstrong's continuing protests provide an inference that the guards knew of a serious risk. For the guards to have continued to refuse Armstrong's complaints and for them to have continued only to check the will call list evinces the serious possibility of deliberate indifference to Armstrong's plight. Therefore, again, Armstrong survives summary judgment.

■ On to Armstrong's fourth claim—if, in fact, he makes a fourth claim. The district court addressed the possibility that Armstrong also leveled an attack on Squadrito and Dill in their individual capacities. We do not see such a claim in Armstrong's complaint. He does sue Squadrito and Dill in their official capacities, but as we explained,

we read such a suit as against the municipality, not the individuals. We could apply the rule that unless the plaintiff does not explicitly name officials in their individual capacity, we treat the case as an official capacity suit. *See Yeksigian,* 900 F.2d at 104. Instead, we will address the issue because of the district court's concern that "language in the Complaint could be construed as claims against Squadrito and Dill in their individual capacities." We also note that the complaint contains a claim for punitive damages. The presence of this claim raises the possibility that Armstrong seeks to pursue all of the people named in their individual capacities. *See Hill v. Shelander,* 924 F.2d 1370, 1372–74 (7th Cir.1991).

Judge Lee granted summary judgment to the defendants because he explained that Armstrong demonstrated no personal involvement by Squadrito and Dill in his detention. While we generally agree with the district judge, we do note that if Squadrito or Dill personally formulated the questionable will call policy, or if they personally formulated the policy or custom of refusing written complaints regarding the will call list, then they *might* face personal liability. In *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir.1985), the court explained that § 1983 held a supervisor liable only for individual wrongdoing. As an example of such misconduct, the court mentioned "evidence ... that [the supervisor] rewrote the guards' manual to eliminate some safety precaution in the event of fire." *Id.* In other words, if the supervisor personally devised a deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act. We see no such facts in Armstrong's case. Thus, we affirm summary judgment on this point.

■ Now we come to the final part of our substantive due process analysis: Viewed in the totality of the circumstances, does the defendants' conduct in depriving Armstrong of a constitutional right shock the conscience? Because this inquiry ultimately defines the parameters of the Fourteenth Amendment, we approach the subject as a question of law. We tread carefully in this area because we recognize that the "shocks the conscience" test carries the "unfortunate connotation of a standard laden with subjective assessments." *County of Sacramento,* —— U.S. at ——, 118 S.Ct. at 1722 (Kennedy, J., concurring). As the Supreme Court observes, "the measure of what is conscience-shocking is no calibrated yard stick." *Id.* at ——, 118 S.Ct. at 1717. Despite the danger of subjectivity,[5] we do think this step is necessary because, as the Court explained, deliberately indifferent conduct may not always shock the conscience: "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Id.* at —— – ——, 118 S.Ct. at 1718–19.

A comparison to *Coleman* will help us discern whether the events of this case shock the conscience. Perhaps more importantly, the comparison to *Coleman* will allow us to resolve this case objectively by measuring it against precedent. We hope that this common law approach can alleviate some of the concerns regarding subjectivity without diminishing the exact case-by-case analysis urged by the Court.

We have already concluded that this case invokes the same substantive due process

5. The Ninth Circuit couches the potential for subjectivity quite nicely when it writes of a judicial sphygmomanometer measuring the court's blood pressure to determine whether the judges' collective conscience received a sufficient shock to make out a due process violation. *See United States v. Luttrell,* 889 F.2d 806, 811 (9th Cir. 1989), *vacated in part,* 923 F.2d 764 (9th Cir. 1991).

Legal history, however, teaches that we should beware the use of sphygmomanometers to measure anything other than blood pressure itself:

The old *Frye* rule for admission of scientific evidence came about in a dispute over whether a sphygmomanometer could measure deception reliably. *See Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). Indeed, some members of this circuit have cast grave doubts on whether the judicial sphygmomanometer should ever guide our jurisprudence. *See Gumz v. Morrissette,* 772 F.2d 1395, 1404 (Easterbrook, J., concurring) (explaining the dangers of judicially created rights).

right identified in *Coleman* despite Armstrong's arrest under civil, rather than criminal, law. And we have already found that the defendants' conduct offends the standards of due process. The only remaining question, therefore, is whether the Allen County defendants' conduct was as offensive as Sheriff Frantz's conduct. Sheriff Frantz recognized his duty to obtain a prompt hearing for Coleman, and the sheriff repeatedly attempted to arrange an appearance for the detainee. Despite Frantz's laudable efforts, the *Coleman* court found that his conduct shocked the conscience. Coleman lost his appeal only because the court awarded immunity to the sheriff. Here, the defendants can point to no commendable efforts—their will call policy was deficient and their practice of refusing complaints was appalling. They made no efforts on behalf of Armstrong because, unlike Sheriff Frantz, they do not seem to have understood their basic responsibility. The defendants' conduct here is far more condemnable than Sheriff Frantz's in *Coleman*. This case is, therefore, easy. What happened to Walter Armstrong shocks the conscience.

 We are left with one remaining concern. Should we affirm summary judgment because the defendants receive qualified immunity? The district court said yes, we say no. With regard to Armstrong's *Monell* claims, the answer to that question could not be more straightforward. A suit against an individual in his or her official capacity is a suit against the municipality, and a municipality does not enjoy qualified immunity from a damage claim under 42 U.S.C. § 1983. *See Hedge v. County of Tippecanoe,* 890 F.2d 4, 8 (7th Cir.1989) (citing *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). We do not know how much more emphatically we can state this rule.

With regard to the individual defendants, our answer is also straightforward. Under *Harlow v. Fitzgerald,* 457 U.S. 800,

102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), individual defendants receive immunity if their conduct did not violate a clearly established right. *Coleman* held that the Fourteenth Amendment guards against a prolonged detention, without a prompt appearance, following an arrest pursuant to a warrant. Our painstaking efforts to ensure that Armstrong's claims fall under that rule do not diminish the forcefulness of the principle, nor do our efforts undermine the fact that *Coleman* has been the law in this circuit for 13 years. As Judge Cudahy explained in his concurring opinion in *Coleman,* while prior to that case there might not have been a sufficiently clear and established duty, "[i]n light of the court's decision today, of course, there should no longer be any doubt." *Coleman,* 754 F.2d at 731 (Cudahy, J., concurring). In other words, because *Coleman* clearly established a right to a prompt appearance after arrest pursuant to a warrant, the individual defendants in this case cannot claim an entitlement to qualified immunity.

Thus, we find that some of Armstrong's federal claims survive summary judgment and we find no qualified immunity for the individual defendants. Of course, because this decision reinstates Armstrong's federal claims, on remand the district court should entertain supplemental jurisdiction over Armstrong's state law claims.[6] Accordingly, the decision of the district court is REVERSED and this case is REMANDED for further proceedings.

---

6. The availability of Armstrong's state law claims does not, as the defendants contend, invoke the rule of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). *See Wilson v. Town of Clayton,* 839 F.2d 375 (7th Cir.1988) (explaining the limited sweep of *Parratt*); *Guen-*

*ther v. Holmgreen,* 738 F.2d 879, 882–83 (7th Cir.1984) (same); see also *Easter House v. Felder,* 910 F.2d 1387, 1396–97 (7th Cir.1990) (en banc) (same and explaining limited sweep of *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).