Gerald G. SCHAEFER and Lyla
Schaefer, Plaintiffs–
Appellants,

v.

Fred J. GOCH and Marathon County,
Defendants–Appellees.

No. 98–1031.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1998.

Decided Aug. 28, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 2, 1998.

Ronald J. Kotnik, Frank C. Sutherland (argued), Lathrop & Clark, Madison, WI, for Plaintiffs–Appellants.

Raymond J. Pollen (argued), Michele M. Ford, Crivello, Carlson, Mentkowski & Steeves Milwaukee, WI, for Defendants–Appellees.

Before CUMMINGS, RIPPLE and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

This case arises out of genuinely tragic events. During the early morning hours of September 25, 1995, Sergeant Fred Goch of the Marathon County, Wisconsin Sheriff's Department unintentionally shot and killed Kathy Nieslowski during a standoff between police and Nieslowski's husband, John. Kathy Nieslowski's parents[1] brought this suit pursuant to 42 U.S.C. § 1983, alleging that Goch and Marathon County violated their daughter's rights under the Fourth and Fourteenth Amendments to the United States Constitution. The district court granted summary judgment in favor of the defendants, and this Court affirms.

## I. BACKGROUND

At about 9:15 p.m. on September 24, 1995, the Marathon County Sheriff's Department received a call stating that a man named John Nieslowski had threatened patrons of a local bar with a shotgun. Nieslowski was reportedly dressed in military fatigues and speaking in an erratic, irrational manner, including making threats to shoot any Everest Metro Police Department officers he might see. Members of the Sheriff's Department's Special Response Team ("SRT") responded to the call, as did officers of the Everest Metro Police Department (which serves three municipalities in Marathon County) and officers from the Town of Rothschild.

The responding officers soon learned that Nieslowski's parents lived at an address not far from the bar. The officers moved to establish a protective perimeter around the Nieslowski home. In the meantime, SRT officers learned from Everest Metro officers who had dealt with Nieslowski on previous occasions that he tended to be violent and unpredictable. A member of the SRT who observed the Nieslowski home from another house across the street saw movement within the home but was not able to determine the number of people who were there. Twice between 10:30 and 11:00 p.m., this SRT member saw a man he believed to be John Nieslowski step out of the home, look around, and then step back inside.

Officers sought a "no-knock" warrant to enter the Nieslowski home; the warrant was granted at approximately 1:00 a.m. on September 25. The SRT's commander met with Everest Metro officers and learned that John Nieslowski was known to them to be a "fighter" and that police had been required to resort to physical measures to subdue him in the past. The officers also told the SRT commander that Nieslowski was a military man who had previously been a suspect in a murder investigation, and that he was physically very strong.

Based on this information and on Nieslowski's conduct in threatening patrons at the bar earlier that evening, the commanders on the scene decided to attempt a "silent entry" through the rear door of the house in order to negotiate with Nieslowski from a position inside. The plan did not succeed, however. When a team of officers commanded by Sergeant Goch entered after battering open the back door, Nieslowski fired at them with a shotgun, striking the ballistics shield that the lead officer carried to protect the group. The SRT officers then retreated outside the house.

After the aborted entry, the SRT officers involved joined their companions in positions around the house. As some of the officers were still seeking suitable vantage points, Kathy Nieslowski walked out the front door of the house onto the porch. Several SRT deputies shouted to her to "get down on the ground" and identified themselves by yelling "Sheriff's Department." Kathy went back inside the house for a moment and then quickly came back outside, at which time the officers again ordered her to "get on the ground." Kathy responded to the deputies' commands and got down on her hands and knees at the top of the porch steps.

---

1. Kathy's mother, Lyla Schaefer, is also the Special Administrator of Kathy's estate.

Immediately after Kathy dropped to all fours, John Nieslowski stepped out the front door carrying a long gun in one hand, cradled beneath his arm. John took hold of Kathy by either the hair or the shoulder with his free hand and began pulling her back toward the door, as she struggled against him. John apparently succeeded in pulling Kathy to her feet, so that he stood either behind or slightly to one side of her (from the vantage point of Sergeant Goch and two deputies who were located near Goch to the south of the porch), with his arm around her neck or shoulder. The officers' stories are not fully consistent as to whether John's gun was pointing to the west the entire time or swung at some point to the south, toward Sergeant Goch.[2] Their statements also differ somewhat as to whether John was standing behind Kathy or whether they moved at some point so that they stood side-by-side, separated by at least a few inches.

What is clear, however, is that the officers shouted at John, "Sheriff's Department, let me see your hands" and "Put down your gun," and that John released his hold on Kathy. Immediately after, Sergeant Goch fired two shots at John from his MP5 submachine gun, and Deputies McCarthy and Bean also fired at John with their handguns at roughly the same moment. One bullet from either McCarthy's or Bean's gun struck John, and he died soon after. One of Goch's two bullets struck Kathy in the back of the head; she died some hours later from the wound.

Kathy's parents filed this suit on June 6, 1997, then amended their complaint on September 9, 1997. Their amended complaint included claims under 42 U.S.C. § 1983 against the City of Schofield,[3] Marathon County, and Sergeant Goch in his individual capacity. The complaint alleged that the

defendants violated Kathy Nieslowski's rights under the Fourth and Fourteenth Amendments to the United States Constitution, and also that they violated Kathy's parents' Fourteenth Amendment right to Kathy's continued society and companionship. The claim against Marathon County alleged that the County failed to train its SRT officers properly in handling situations such as the one that led to Kathy's death.

On December 2, 1997, Judge John C. Shabaz granted summary judgment in favor of Sergeant Goch and Marathon County on all of the Schaefers' claims. The court entered its judgment the next day, and the plaintiffs filed a timely notice of appeal.

## II. DISCUSSION

### A. Standard of Review

■■■ This Court reviews the district court's grant of summary judgment de novo. Cornfield by Lewis v. Consolidated High School Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir.1993). We apply the same standard as the district court, granting summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. The requirement that a disputed fact be material means that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. In evaluating a summary judgment motion, we construe the evidence in the light most favorable to the nonmoving party

---

2. In statements given shortly after the incident, only Sergeant Goch reported having seen Nieslowski's gun swing southward toward the officers. The other SRT members reported either that the gun was pointed to the west or that it was pointed at Kathy. In subsequent interviews conducted some two weeks after the shooting, the other officers reported that Nieslowski did in fact begin to swing his gun toward the officers before Goch and the others fired their weapons. The defendants' explanation for the discrepancy—that the officers merely failed to "include

every detail in their initial written reports" (Appellants' Brief at 25)—is not convincing; it hardly seems an insignificant detail that the shots were allegedly fired as a result of Nieslowski's turning his weapon on the officers. For this reason, we will analyze the case on the assumption that Nieslowski's gun was not pointed toward the officers.

3. The claim against the City of Schofield was dismissed on October 31, 1997. That dismissal is not at issue in this appeal.

and draw all justifiable inferences in favor of that party. *Id.* at 255, 106 S.Ct. 2505.

### B. Fourth Amendment

 An initial task for a court faced with a suit under 42 U.S.C. § 1983 claiming that government agents have used excessive force is to "identify[ ] the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Plaintiffs contend that the SRT officers had effectively seized Kathy Nieslowski before she was shot, and thus that their claim against Sergeant Goch and the County should be analyzed using Fourth Amendment standards. The Supreme Court's recent decision in *County of Sacramento v. Lewis,* —— U.S. ——, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), however, illustrates the error in this position.

It is true that the Supreme Court has held that "all claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham,* 490 U.S. at 395, 109 S.Ct. 1865. In *Lewis,* however, the Court reiterated the point that this preference for the more specific provisions of the Fourth Amendment over the "generalized notion of substantive due process," *Lewis,* 118 S.Ct. at 1708, does not apply unless the actions of the government agents in fact amount to a seizure. *Id.* at ——, 118 S.Ct. at 1715.

In *Lewis,* the Court held that no seizure took place when a police officer pursued a suspect and his passenger at high speeds and then struck and killed the passenger after the suspect's motorcycle tipped over. *Id.* at ——, 118 S.Ct. at 1712, 1715 (disapproving of finding of seizure on similar facts in *Mays v. East St. Louis,* 123 F.3d 999 (7th Cir.1997), certiorari denied, —— U.S. ——, 118 S.Ct. 2059, 141 L.Ed.2d 137). The Court distinguished that situation from the one present in *Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), in which a suspect fleeing officers at high speed died after crashing into a police roadblock erected for the purpose of stopping him.

The Court noted that in *Brower* it had held that a seizure required "a governmental termination of freedom of movement *through means intentionally applied.*" *Lewis,* —— U.S. at ——, 118 S.Ct. at 1715 (*quoting Brower,* 489 U.S. at 597, 109 S.Ct. 1378). Because the officer did not intend to seize Lewis by striking him with his vehicle, Lewis was not seized even though his freedom of movement was undoubtedly terminated.

In language pertinent to the present case, the Court stated that "a police pursuit in attempting to seize a person does not amount to a 'seizure.'" *Id.;* see also *California v. Hodari D.,* 499 U.S. 621, 626 n. 2, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("[N]either usage nor common-law tradition makes an attempted seizure a seizure."). The Court in *California v. Hodari D.* had held that a suspect was not seized at the instant when he threw away a rock of crack cocaine moments before being tackled by a police officer he had just seen pursuing him. 499 U.S. at 623, 629, 111 S.Ct. 1547. In order to effect a seizure, the Court declared, either the officer must physically touch the suspect or the suspect must yield to the officer's show of authority by stopping his flight or otherwise showing his surrender. See *id.* at 626, 111 S.Ct. 1547.

In the case at hand, the plaintiffs argue that Kathy Nieslowski was seized under the second of these two definitions when she complied with commands from the SRT officers to "get down" on the porch after she exited the house. This sequence of events, they claim, meets the requirement that a seizure involve "a governmental termination of freedom of movement through means intentionally applied." *Brower,* 489 U.S. at 597, 109 S.Ct. 1378. The officers intended that their commands would lead Kathy to drop to the porch floor and remain immobile, and that is exactly what she did in response to those commands.

But the fact that Kathy was temporarily immobile does not necessarily mean that her freedom of movement was terminated. The officers were in no position to stop her from reentering the house had she chosen to do so (at least short of intentionally shooting her). Even more importantly, given what actually

occurred, the officers were not in a position to stop Kathy's husband from taking physical control of her himself. The Supreme Court posed an analogous example in *Hodari D.* "If ... [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had then cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest." *Hodari D.*, 499 U.S. at 625, 111 S.Ct. 1547. "A seizure is a single act, and not a continuous fact." *Id.* (quoting *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 471, 21 L.Ed. 897). The only difference between this hypothetical and the present case is that Kathy was "retaken" by another instead of attempting to escape herself. It is difficult to see how, even assuming that a seizure took place when Kathy complied with the officers' commands, that seizure could be seen as continuing once John began to pull Kathy back inside. The Fourth Amendment is therefore not applicable to the Schaefers' claims under 42 U.S.C. § 1983.

### C. Fourteenth Amendment

To say that the Fourth Amendment does not provide the standard for this case is not, of course, necessarily to say that plaintiffs cannot prevail. It simply means that if they are to have any recovery at all, it must come by way of the Fourteenth Amendment's protection of substantive due process. See *Lewis*, — U.S. at — - —, 118 S.Ct. at 1715–1716 (applying substantive due process standards to claim of arbitrary police action not encompassed by Fourth Amendment); *Armstrong v. Squadrito*, 152 F.3d 564, 575 (7th Cir.1998) (analyzing claim of unlawful detention pursuant to civil warrant under substantive due process principles).

■ The guarantee of due process serves to protect "the individual against arbitrary action of government." *Id.* at —, 118 S.Ct. at 1716 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935). As distinct from procedural due process, the substantive component of due process pro-

tects against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Under this principle, courts have found violations of substantive due process where, for example, police officers forcibly pumped a suspect's stomach in order to obtain evidence against him. *Rochin v. California*, 342 U.S. 165, 172–173, 72 S.Ct. 205, 96 L.Ed. 183.[4]

■ In many instances, the due process standard under which courts must evaluate the conduct of government officials is referred to as "deliberate indifference." See, *e.g.*, *Soto v. Johansen*, 137 F.3d 980, 981 (7th Cir.1998). Thus, if prison or jail officials subject an inmate under their authority to dangers that they might have prevented, they may be held liable if their failure to forestall the harm resulted from deliberate indifference to a known danger. See, *e.g.*, *Hudson v. McHugh*, 148 F.3d 859 (7th Cir. 1998) (finding sufficient to state claim for denial of substantive due process the allegation that jailors failed to make epilepsy medication available to inmate while knowing that he needed it).

The Supreme Court's decision in *County of Sacramento v. Lewis*, however, clarifies that not all substantive due process claims are to be assessed through the lens of deliberate indifference. Deliberate indifference, in fact, is merely the manifestation in certain situations of a more general inquiry, which is whether the government conduct at issue "shocks the conscience." — U.S. at — - —, 118 S.Ct. at 1717–1718. In holding that deliberate indifference was not a proper statement of the "conscience-shocking" standard in the context of a high-speed chase, the Court focused on the necessity for officers to make rapid, spur-of-the-moment decisions. "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Id.* at 1719.

---

4. As the Supreme Court has subsequently noted, the violation in *Rochin* would today be analyzed using Fourth Amendment standards; at the time the case was decided, Fourth Amendment protections had not yet been held to restrict the actions of the states. See *Lewis,* — U.S. at — n. 9, 118 S.Ct. at 1718 n. 9; *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (enforcing Fourth Amendment protections against the states).

This Court has already had occasion to apply the teachings of the *Lewis* case, in *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998). There, a county sheriff seized the plaintiff pursuant to a civil "body attachment warrant," then held him for 57 days despite the fact that the warrant authorized only a brief detention for the purpose of delivering the plaintiff to appear before a local court. *Id.* at 567. This Court noted the Supreme Court's statement in *Lewis* that custodial settings such as prisons, in contrast to the high-speed chase at issue in *Lewis* itself, are particularly appropriate for the use of the deliberate indifference standard because of the opportunity for forethought. *Id.* at 576–77 (quoting *Lewis*, —— U.S. at ——, 118 S.Ct. at 1720) ("[L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations."). The Court then concluded that the sheriff and his employees should be held to the standard of deliberate indifference. *Id.*

■ The facts in the present case, however, are much more similar to those in *Lewis* than they are to those in *Armstrong*, and in precisely the sense that the *Lewis* Court found pertinent. The SRT officers were faced with a dangerous, fluid situation, in which they were forced to make decisions "in haste, under pressure, and ... without the luxury of a second chance." *Id.* at 1720 (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251). When government officers face the sort of unforeseen and rapidly changing circumstances that demand unreflective decisions with potentially grave consequences on every side, "even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates [the concerns of substantive due process]." *Id.*

Since the "shocks the conscience" standard's first appearance, it has been criticized as overly vague. See *Rochin*, 342 U.S. at 175, 72 S.Ct. 205 (Black, J., concurring); *id.* at 179, 72 S.Ct. 205 (Douglas, J., concurring). Even the Court's opinion in *Lewis* notes that "the measure of what is conscience-shocking is no calibrated yard stick." *Lewis*, —— U.S. at ——, 118 S.Ct. at 1717. The Court, however, gave additional precision to the standard for the kind of situation before it by holding that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983." *Id.* The *sine qua non* of liability in cases analogous to high-speed chases, therefore, is "a purpose to cause harm." *Id.*

In our case, of course, the officers who fired their weapons did intend to harm the suspect, John Nieslowski, but it is not John on whose behalf this suit was brought. (Of course, we do not mean to imply that a suit on his behalf would be more likely than the present claim to succeed.) Nobody has suggested that the officers intended to harm Kathy Nieslowski, and so the straightforward application of the *Lewis* analysis yields a verdict in favor of defendants.

On the other hand, firing a gun when an innocent party who has just attempted to surrender is standing, by most accounts, only inches from the intended target seems even more dangerous a course than pursuing a suspect at high speeds through city or suburban streets. Under the analysis employed in *Lewis*, however, the officers' decision to fire does not "inch close enough to harmful purpose" to shock the conscience, even assuming that John never swung his weapon in the direction of the officers. Given the high-pressure, life-and-death nature of the standoff, the officers were not required to wait until John actually pointed his shotgun at them. The man they saw before them had already fired upon officers once, he was known to be a "fighter," and he had threatened a number of other persons with the same type of weapon he carried with him onto the porch. The situation was fluid, uncertain, and above all dangerous, and the officers' decision to shoot, regrettable though its results turned out to be, does not shock the conscience. For this reason the inconsistencies among the officers' statements concerning whether John ever pointed the gun in their direction, even assuming they give rise to a genuine issue of fact, do not bear upon a *material* fact, that is, one that could alter the outcome of the case. See *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.

Because we have concluded that Sergeant Goch did not violate Kathy Nieslowski's rights under the Constitution, her parents' claims based on the loss of her society and companionship necessarily fail as well. Likewise, the claim against Marathon County for failure to train its officers cannot stand once the underlying claim against Sergeant Goch has fallen. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 596–597 (7th Cir. 1997), *certiorari denied*, —— U.S. ——, 118 S.Ct. 1052, 140 L.Ed.2d 115.

## CONCLUSION

Kathy Nieslowski was not seized at the time that Sergeant Goch shot and killed her, and therefore Fourth Amendment standards do not govern this case. Under the substantive due process component of the Fourteenth Amendment, the proper inquiry in a case such as this one is whether the officer's conduct was enough to shock the conscience. This Court holds that Sergeant Goch's decision to fire, while certainly regrettable in hindsight, did not evince the purpose to harm that the Supreme Court has said is necessary for liability. Neither the Schaefers' claim for loss of companionship nor the failure to train claim against Marathon County can survive the failure of the underlying claim. The district court was therefore correct in granting summary judgment in favor of the defendants on all counts.

AFFIRMED.