In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3400

LESTER BUBLITZ, individually, and on behalf of the
ESTATES OF REBEKAH BUBLITZ and NATHANIEL BUBLITZ,

*Plaintiff-Appellant*,

*v.*

JACK L. COTTEY, individually, Marion County Sheriff,
CAPTAIN BENNY DIGGS, individually, Marion County
Sheriff's Department, SERGEANT DAVID DURANT,
individually, Marion County Sheriff's Department,
LIEUTENANT HARRY HALL, individually, Marion
County Sheriff's Department,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99-C-0167—**John Daniel Tinder**, *Judge*.

ARGUED FEBRUARY 10, 2003—DECIDED APRIL 9, 2003

Before POSNER, MANION and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*.  Lester Bublitz, his wife Rebekah,
and his son Nathaniel became tragic, innocent victims in
a high-speed police chase near Indianapolis, Indiana.
When police officers attempted to stop a fleeing armed rob-
ber by using a tire-deflation device, his car veered across

the highway, colliding with the minivan in which the Bublitz family was riding. The crash killed Mrs. Bublitz and son Nathaniel. Mr. Bublitz brought suit against the law-enforcement officers involved, claiming that his and his deceased family members' federal and state constitutional rights were violated by the officers' actions in attempting to stop the fleeing robber. The district court, finding that the defendant officers did nothing that effected a deprivation of the Bublitz family members' rights, granted summary judgment in favor of the defendants. We affirm.

## HISTORY

In the summer of 1997, police officers began an automobile pursuit of Kevin James, who had robbed a McDonald's restaurant in Carmel, Indiana. When the Carmel officers first attempted to stop James, he pulled away from their marked police car and began a high-speed getaway on the northwest side of Indianapolis. The police followed James onto I-465, an interstate highway that circles Indianapolis. James was unsuccessfully pursued for some 20 miles by the Carmel police officers, as well as by units from the Indiana State Police and Marion County Sheriff's Department. At times, the chase reached speeds of over 100 miles per hour. Because of the risks inherent in such a chase, it was decided that an attempt to stop James's vehicle should be made. Near I-465 and Rockville Road, the police deployed a tire-deflation device, but James was able to avoid it. A second attempt to use a tire-deflation device at another location along the path of the chase was contemplated and rejected.

Meanwhile, at the time of the pursuit, Marion County Sheriff's Department Sergeant David Durant was off-duty and at home. Durant became aware of the chase on I-465 while monitoring his police radio. Because the chase

was nearing his home, Durant radioed his supervisor, Captain Benny Diggs, to inform him of his availability to deploy another tire-deflation device. Captain Diggs approved of Durant's decision to use the device and directed him to make sure that the deployment was done in communication with the pursuing officers to ensure their safety.

After speaking with Diggs, Durant drove to the Harding Street exit off of I-465 where he parked his police car. He crossed three lanes of traffic to the median of the interstate highway. He saw the high-speed pursuit approaching his position. With James's white BMW about one mile away, Durant prepared a "Stinger Spike System"; approximately 10 seconds before James reached him, he deployed the spikes. After James ran over the spikes, his car veered to the right, impacting the left side and left rear of the Bublitz vehicle. Rebekah and Nathaniel Bublitz were killed as a result of the collision.

Lester Bublitz, for himself and on behalf of the estates of his deceased wife and child, brought this suit in the Southern District of Indiana, claiming that various law-enforcement officers[1] had violated his and his family's civil rights. He sought relief under 42 U.S.C. §§ 1983, 1985, 1986, 1988, the Fourth and Fourteenth Amendments, and the Indiana state constitution.[2] The defendant officers

---

[1] Bublitz originally included the City of Carmel and two Indiana State Police troopers as defendants. The claims against the City were dismissed by the district court on November 14, 2000, and the state troopers were granted summary judgment in the district court's August 8th order. The claims against these defendants have not been pursued in this appeal.

[2] There was some dispute in the district court as to whether Mr. Bublitz also brought claims under 42 U.S.C. § 1981, the Fifth Amendment, and state law. The court below held that the plaintiff's amended complaint had not included a § 1981 or Fifth

(continued...)

moved for summary judgment, and the district court granted their motion, ruling that Mr. Bublitz had failed to show that either he or his deceased family members had been deprived of their constitutional rights.

Mr. Bublitz appealed. The only issues for our consideration here are whether Mr. Bublitz has presented actionable Fourth or Fourteenth Amendment claims. Based on the facts as described by Mr. Bublitz, we find that neither he nor his family members suffered any deprivation of their rights under these two constitutional provisions, and we affirm the grant of summary judgment in favor of defendants.

## ANALYSIS

We review a grant of summary judgment *de novo*, viewing all facts and taking all inferences from those facts in a light most favorable to the nonmoving party. *Chavez v. Cady*, 207 F.3d 901, 902 (7th Cir. 2000). Summary judgment is appropriate when no genuine issue of material fact has been raised, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

To state a claim under 42 U.S.C. § 1983, a plaintiff must present facts sufficient to show that the defendants, acting under color of state law, deprived him of a specific right or interest secured by the Constitution or laws of the

---

[2] (...continued)

Amendment claim. The court also found that references to claims under "State Law" failed to provide adequate notice as to the nature of those claims. The district court therefore did not address claims asserted under these three provisions and, because that decision is not challenged here, neither do we.

United States.[3] *See* 42 U.S.C. § 1983 (2003); *Payne v. Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998). In this case, there is no dispute that the defendant officers were acting under color of state law. Rather, the question is whether, during their effort to apprehend Kevin James, the defendants violated any constitutional rights enjoyed by the Bublitz family.

Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced. *See Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Our first task, therefore, is to identify the specific constitutional or statutory rights allegedly infringed. *Payne*, 161 F.3d at 1039 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Those specific rights in turn provide "'the appropriate analytical lens through which facts are to be viewed,'" directing us to the proper doctrinal framework in which to address the claims. *Id.* (quoting *Wilson v. Williams*, 83 F.3d 870, 874 (7th Cir. 1996)). In this case, Mr. Bublitz has alleged a deprivation of his and his family's rights under the Fourth and Fourteenth Amendments of the federal constitution. We analyze each claim in turn to determine whether he has sufficiently presented evidence of actual violations.

---

[3] Our discussion of Mr. Bublitz's § 1983 claim is sufficient to dispose of his other claims. Section 1985 prohibits conspiracies to interfere with civil rights, and § 1986 deals with failing to prevent a conspiracy to violate civil rights. Section 1988 provides for an award of attorney's fees to a prevailing party in a civil rights action. Because we hold that neither Mr. Bublitz nor the deceased members of his family have suffered a deprivation of their constitutional rights under § 1983, there is similarly no constitutional violation to support these other claims. In addition, Mr. Bublitz has not pressed his claims under the Indiana constitution in this appeal.

### A. *Fourth Amendment Claim*

The Fourth Amendment prohibits the governmental seizure of a person unless that seizure is reasonable. *See* U.S. CONST. amend. IV. Mr. Bublitz asserts that the defendant officers violated his and his family's rights under the Fourth Amendment by intentionally and unreasonably "seizing" them—that is, terminating their freedom of movement—during their attempt to stop Kevin James from evading arrest. Mr. Bublitz contends that the police, by intentionally deploying the "Stinger Spike System" to terminate James's freedom of movement, also intentionally "seized" the Bublitz family by terminating their freedom of movement through the subsequent collision. It would follow that the family had been deprived of their Fourth Amendment rights, Mr. Bublitz's argument continues, as this "seizure" would have been unreasonable.

Where Mr. Bublitz's argument fails, however, is in asserting that the termination of the family's freedom of movement amounted to a "seizure" as that term is understood under the Fourth Amendment. The Supreme Court has stated that "'a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is governmental termination of freedom of movement *through means intentionally applied*.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original)). In light of *Lewis*, this Court has emphasized the distinction between "an accidental or tortious act which happens to be committed by a governmental official and an intentional detention that rises to the level of a constitutional violation." *Campbell v. White*, 916 F.2d 421, 422-23 (7th Cir. 1990) (citation omitted). In

*Campbell*, we held, consistent with the rule of *Brower* and *Lewis*, that an officer's action in accidentally running over a fleeing suspect did not constitute a seizure, as the officer's action was not the "the means intentionally applied to effect the stop, but was rather an unfortunate and regrettable accident." *Id.* at 423 (citations omitted).

The same reasoning applies here. The police officers involved in the high-speed pursuit of Kevin James did not intentionally apply *any* means in an attempt to terminate the freedom of movement of the Bublitz family—the unfortunate collision between James and the Bublitzes was not a means intended by police to stop the family, but rather an unintended consequence of an attempt to seize James. This would seem to preclude any finding that the Bublitz family was "seized" by the police as a result of the crash.

Mr. Bublitz attempts to distinguish these cases by making a kind of transferred intent argument. He notes that James's car was stopped or "seized" by Officer Durant's deployment of the Stinger Spike System—a "means intentionally applied." Because that intentional act had the further consequence of stopping the Bublitz vehicle, the argument goes, Durant must have intended to seize the Bublitz car as well. But it does not follow that because Durant intended to stop James's car, he therefore intended to stop any other car that could potentially become involved in a subsequent collision. The subsequent collision was instead the accidental and wholly unintended consequence of an act that happened to be committed by a government official. The Bublitz family was simply not the intended object of the defendant officers' attempts to seize the fleeing James, so the Fourth Amendment is not implicated and cannot provide the basis for a § 1983 claim.

B. *Fourteenth Amendment Claim*

Mr. Bublitz also asserts that the defendant officers violated his and his family's substantive-due-process rights under the Fourteenth Amendment. The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment includes within its ambit "'protection of the individual against arbitrary action of government.'" *Lewis*, 523 U.S. at 845 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). In reviewing exercises of executive power, however, we must bear in mind that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'" thus amounting to a violation of constitutional dimensions. *Id.* at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).

Because the due process clause was not meant to serve as a "font of tort law to be superimposed upon whatever systems may already be administered by the States," *Paul v. Davis*, 424 U.S. 693, 701 (1976), only those governmental actions which involve substantial culpability are actionable under the Fourteenth Amendment. Since the 1952 case of *Rochin v. California*, the Supreme Court has characterized this cognizable level of conduct as that which "shocks the conscience." 342 U.S. 165, 172 (1952); *see also Lewis*, 523 U.S. at 846-47.

On some occasions, courts have spoken of a "deliberate indifference" standard for measuring whether conduct violates the Fourteenth Amendment. *See Lewis*, 523 U.S. at 850-54; *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). This Court has noted that the Supreme Court in *Lewis* seemed to differentiate between three distinct levels of fault: negligence (which falls below the threshold required for a constitutional deprivation), deliberate indifference, and conscience-shocking. *Payne*, 161 F.3d at 1040. But we have also cautioned against reading those classifications too rigidly, noting that "[d]eliberate indifference, in

fact, is merely the manifestation in certain situations of a more general inquiry, which is whether the government conduct at issue 'shocks the conscience.'" *Schaefer v. Goch*, 153 F.3d 793, 797 (7th Cir. 1998).

To rise to the level of a constitutional violation, a deliberately indifferent act must be one which is conscience-shocking—the Supreme Court has acknowledged that not every deliberately indifferent action will rise to the "constitutionally shocking level." *See Lewis*, 523 U.S. at 852 ("But just as the description of the custodial prison situation shows how deliberate indifference can rise to a constitutionally shocking level, so too does it suggest why indifference may well not be enough for liability in the different circumstances of a case like this one."). The Supreme Court has also noted that the "deliberate indifference" articulation should only be used when actual deliberation by a defendant was possible. *See id.* at 851 (citing *Whitley v. Albers*, 475 U.S. 312, 320 n.11 (1986)). It was this last observation that led the Court to conclude that the deliberate-indifference standard is inappropriate to high-speed police-chase settings. *Id.* at 853-54.

In this case, much of the argument goes to whether the shocks-the-conscience or the deliberate-indifference standard is the appropriate benchmark by which to determine if the defendant officers' conduct violates the Fourteenth Amendment. Mr. Bublitz attempts to distinguish *Lewis* by noting that Officer Durant had at least three to five minutes in which he had to decide whether to deploy the spikes, giving him adequate time to deliberate. The officers counter that the circumstances of a high-speed police pursuit—which entail constantly changing conditions—do not lend themselves to careful and considered deliberation. But we need not choose between the two formulations of the constitutional standard (even assuming they present different inquiries), as we believe that Mr. Bublitz has not presented facts which rise to either level.

At most, Mr. Bublitz has described a scenario in which Durant may have been negligent in deciding to deploy his Stinger Spike System, but mere negligence is insufficient to give rise to a constitutional violation under the Fourteenth Amendment. *Id.* at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." (citations omitted)).

In our evaluation of the grant of summary judgment, we must assume that Officer Durant had adequate time to deliberate on the use of the Stinger system. Taking into consideration the rapidly and constantly changing conditions, Durant would have been required to assess traffic conditions, as well as the position of the fleeing suspect and pursuing officers, as they existed at the moment before deployment. But that does not lead to the conclusion that he acted with complete disregard for the potential consequences of his actions. Deciding whether to deploy the Stinger system meant weighing a number of potential risks, including the risk posed by allowing the high-speed chase to continue on public streets. Given that a similar tire-deflation device had been used (unsuccessfully, but without incident) earlier in the chase, and that Durant had participated in another high-speed chase that had been successfully ended by the use of stop sticks, it is not reasonable to assume that Durant knew with any certainty that his use of the Stinger system in this instance would have resulted in a collision impacting innocent bystanders. Thus, it would be incorrect to say that Durant knew of an excessive risk that using the system under the conditions then existing would cause a collision, but nevertheless proceeded to deploy the deflation device.

The shocks-the-conscience standard also requires more than what Mr. Bublitz has presented here. While the standard is "no calibrated yard stick," *id.* at 847, it does, as we have noted, require substantial culpability. It is generally only *deliberate* action intended to harm another

that is the type of conduct targeted by the Fourteenth Amendment: "[C]onduct *intended* to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (emphasis added). In fact, in applying the rule from *Lewis*, we have held that, "The *sine qua non* of liability in cases analogous to high-speed chases, therefore, is a purpose to cause harm." *Schaefer*, 153 F.3d at 798 (quotation omitted).

Here, all that the police officers did was deploy a tire-deflation device (or authorize its deployment) in the hope that it would stop James's flight. Mr. Bublitz makes no accusation that the defendants intentionally misused the device, or that they intended to cause a collision that would include the vehicles of innocent bystanders. *Cf. Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) ("When a citizen suffers physical injury due to a police officer's *negligent use* of his vehicle, no section 1983 claim is stated. . . . It is a different story when a citizen suffers or is seriously threatened with physical injury due to a police officer's *intentional misuse* of his vehicle." (citation omitted) (emphasis in original)). Because Mr. Bublitz does not seek to prove any intention or purpose on the part of the defendants to cause harm to the Bublitz family during the course of the high-speed chase, he cannot show that what the officers did deprived him or his family of their Fourteenth Amendment rights.

## CONCLUSION

Mr. Bublitz suffered a tragic loss when his wife and child were killed during the police pursuit. He has not, however, provided facts which can reasonably lead to the conclusion that the police conduct that precipitated his loss rose to the level of a constitutional violation under

either the Fourth or Fourteenth Amendments. Accordingly, summary judgment in favor of the defendant officers is AFFIRMED.

A true Copy:

        Teste:

                        _____

                       *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*