In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2592

SHANE A. HOLLOWAY,

*Plaintiff-Appellant,*

*v.*

DELAWARE COUNTY SHERIFF, in his
official capacity; LEANNA R. ST. MYER;
TERRI HAMILTON; and DR. NADIR H. AL-SHAMI,
in their individual capacities,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 10 CV 1007—**Jane E. Magnus-Stinson**, *Judge.*

ARGUED OCTOBER 23, 2012—DECIDED NOVEMBER 20, 2012

Before FLAUM and SYKES, *Circuit Judges*, and RANDA,
*District Judge.**

_____

* The Honorable Rudolph T. Randa, United States District
Court for the Eastern District of Wisconsin, sitting by designa-
tion.

FLAUM, *Circuit Judge*. On September 29, 2009, Shane Holloway was arrested without a warrant and detained in the Delaware County Jail. Although Holloway had a probable cause determination the day after his arrest and an initial appearance in front of a judicial officer within three days of his arrest, he was detained for nine days without having any charges filed against him. During the time he spent in the Delaware County Jail, Holloway received care from the jail's medical staff. Before his detention, Holloway had been taking prescribed Oxycontin and other medications to treat chronic pain caused by his Klippel-Trenaunay Syndrome. The jail physician did not believe that Oxycontin was necessary to treat Holloway's chronic pain and he instead prescribed non-narcotic pain medications and other medications to prevent narcotic withdrawal symptoms. After the prosecutor did not file charges against Holloway within the time allowed by the court, Holloway was released from the jail and was admitted to a hospital, during which time he resumed his regimen of Oxycontin. In August 2010, Holloway filed suit under 42 U.S.C. § 1983, alleging that the Delaware County Sheriff ("the Sheriff") violated his rights by detaining him without charges for nine days and that the jail physician and two of his attending nurses violated his constitutional rights by acting with deliberate indifference as to his serious medical condition. The district court granted summary judgment in defendants' favor. For the reasons set forth below, we affirm.

## I. Background

On Tuesday, September 29, 2009, Holloway left his home to drive to Anderson, Indiana with a friend. Police stopped Holloway on his way to Anderson and took him to the Delaware County Sheriff's office for questioning. Holloway arrived at the Sheriff's office at around 5:00 PM, and officers questioned him from about 5:30 PM to 5:45 PM. Shortly thereafter, Holloway was placed in a holding cell, fingerprinted, and processed. Guards locked him in a jail cell at the Delaware County Jail by 7:40 PM.

On the next day, September 30, Delaware County Master Commissioner Darrell Peckinpaugh made a probable cause determination that Holloway had been dealing in a controlled substance, a class B felony, and had been maintaining a common nuisance, a class D felony. At around 11:00 AM on October 2, the third day after his arrest, Holloway appeared in front of Delaware County Master Commissioner Joseph Speece via video conference for an initial hearing. At that time, the court informed Holloway of the probable cause determination, informed him of his rights, appointed an attorney, and ordered that he be held without bond. Pursuant to an Indiana rule of criminal procedure, the court then continued the initial hearing to allow the prosecutor more time to evaluate the case and to determine whether to file formal charges against Holloway. The court ordered that Holloway be released if the prosecutor did not file formal charges against him by 9:00 AM on October 7.

During the course of his detention at the Delaware County Jail, Holloway was under the care of the facility's

medical staff. Holloway suffers from Klippel-Trenaunay Syndrome, a blood clotting disorder that causes port-wine stains on the body and chronic pain. At about 7:00 PM on September 29, the day Holloway arrived at the jail, Nurse Leanna St. Myer examined Holloway and recorded information about his medications. Nurse St. Myer noted that police detectives had confiscated all of his medication as evidence at the time of his arrest. She also noted that Holloway had a port-wine stain over seventy-five percent of his body. Holloway reported that he took blood pressure medication, Elavil, Coumadin, and Oxycontin to treat his medical conditions. Nurse St. Myer advised Holloway that he would unlikely be permitted to take Oxycontin in the jail because the jail physician, Dr. Nadir Al-Shami, rarely prescribes narcotics to treat chronic pain. After taking Holloway's vital signs, Nurse St. Myer called Dr. Al-Shami and reported to him the list of medications Holloway took and for what conditions, including Oxycontin for pain. Instead of prescribing Oxycontin, Dr. Al-Shami prescribed Ibuprofen and Extra Strength Tylenol to manage Holloway's pain and ordered Vistaril, Clonidine, and Donnatal to prevent and treat narcotic withdrawal. Dr. Al-Shami also prescribed the other medications Holloway had been taking prior to his arrest, including Metoprolol, Coumadin, and Nexium. On October 1, Dr. Al-Shami authorized a prescription of Elavil and ordered an increase in the doses of Vistaril, Extra Strength Tylenol, and Ibuprofen.

During the nine days Holloway remained in the jail, on-duty nurses administered Holloway's medication

pursuant to Dr. Al-Shami's orders and monitored his condition. Nurse Terri Hamilton gave Holloway his morning medication from September 30 to October 3 and from October 5 to October 7. Nurse St. Myer gave Holloway his afternoon and evening medication from September 30 to October 2 and also gave him his afternoon and evening doses on October 6. When Nurse Hamilton and Nurse St. Myer were not on duty, other nurses gave Holloway his morning, afternoon, and evening doses of medication. On two occasions, Holloway refused his morning dose of Extra Strength Tylenol and Ibuprofen.

On October 6, Dr. Al-Shami visited Holloway in the jail. Although his vital signs were normal, Holloway complained of pain in his left leg. In response to this complaint, Dr. Al-Shami ordered tests to check Holloway's blood clotting. Aside from this one complaint, the attending nurses reported that Holloway did not express any concerns of pain and he did not exhibit any signs or symptoms that he needed additional medical treatment. Holloway asserts, however, that he experienced intense pain from September 30 to October 7 because he was not taking Oxycontin and that he was doubled over on the ground in his cell. Nevertheless, he testified during his deposition that he stayed quiet and did not file complaints against the nurses or the doctor for not prescribing Oxycontin.

When the prosecutor did not file formal charges against Holloway by 9:00 AM on October 7, the guards released him from jail. After his release, Holloway was admitted

to Goshen General Hospital for four to five days, during which time he resumed his regimen of Oxycontin.

In August 2010, Holloway filed suit against the Sheriff, Dr. Al-Shami, Nurse St. Myer, and Nurse Hamilton under 42 U.S.C. § 1983. In his second amended complaint, Holloway claimed "a loss of liberty, physical pain, mental suffering, emotional distress, [and] loss of freedom and liberty," as a result of defendants' actions. Holloway sued the Sheriff in his official capacity, alleging that he violated the Fourth and Fourteenth Amendments when he held Holloway in jail for nine days without informing him of the charges against him. As to Dr. Al-Shami, Nurse St. Myer, and Nurse Hamilton, Holloway claimed that they violated the Eighth Amendment in their individual capacities because they were deliberately indifferent to his serious medical needs.

The Sheriff filed a motion for summary judgment in December 2011 and Dr. Al-Shami, Nurse St. Myer, and Nurse Hamilton filed a motion for summary judgment in January 2012. The district court concluded, with regard to the Sheriff, that Holloway did not show that an unconstitutional policy or custom resulted in a constitutional deprivation. The court also concluded that Holloway did not produce sufficient evidence to support an inference that either the doctor or the nurses were deliberately indifferent to Holloway's serious medical needs.

## II.  Discussion

On appeal, Holloway challenges the district court's entry of summary judgment in favor of defendants. He contends that there is a genuine dispute of material fact that both the Sheriff and the medical defendants violated his constitutional rights when he was held in the jail for nine days. We review the district court's grant of summary judgment de novo, construing all facts and drawing all reasonable inferences in the light most favorable to the non-moving party. *Lane v. Williams*, 689 F.3d 879, 881 (7th Cir. 2012). The district court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A.  Claims Against the Sheriff

Holloway argues that the Sheriff is liable in his official capacity for allowing Holloway to be held for nine days in jail without being charged with a crime. He contends that the Sheriff lacked a policy to track detainees who were being held without pending charges and that the nine-day detention resulting from the lack of a policy violated the Due Process Clause of the Fourteenth Amendment. The district court held that Holloway did not suffer a constitutional deprivation because he had a probable cause determination within twenty-four hours of his arrest, he had an initial hearing via video conference within three days of his arrest, and the Sheriff released him within seventy-two hours of his

initial hearing, excluding weekends, when the pros-ecutor did not file formal charges against him. The court also held that even if Holloway could show that he suffered a constitutional deprivation, he did not show that the alleged deprivation was a result of an existing policy, rather than an isolated incident, which is neces-sary when a plaintiff sues a municipality.

### 1.  The Length of Holloway's Detention Did Not Violate the Fourteenth Amendment.

Our cases have established that "the Fourth Amend-ment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause." *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992). Here, although officers arrested Holloway without a warrant, there is no dispute that Holloway had a probable cause deter-mination within forty-eight hours of his arrest as required by *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975). Thus, Hol-loway's case rests on whether the Sheriff violated the Due Process Clause of the Fourteenth Amendment. *See Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998). When a plaintiff brings a § 1983 claim under the Due Process Clause, "the question is whether an executive abuse of power shocks the conscience." *Id.*

To survive summary judgment on a § 1983 claim, the plaintiff must put forth evidence to establish that the defendant intentionally or recklessly deprived him of a

constitutional right. *Id.* In the context of substantive
due process, the inquiry involves "an appraisal of the
totality of the circumstances rather than a formalistic
examination of fixed elements." *Id.* Thus, in assessing
whether the Sheriff is entitled to summary judgment on
Holloway's § 1983 claim, we must determine whether
the Due Process Clause protects against a nine-day de-
tention without the filing of charges, whether the
Sheriff's conduct offended the standards of substantive
due process, and whether the totality of the circum-
stances shocks the conscience. *Id.*

Many of our cases addressing the due process implica-
tions of confinement after an initial probable cause deter-
mination involve detainees who were held for an
extended period of time despite repeated protests of
innocence and without any investigation as to their
claims of innocence. In *Coleman v. Frantz*, the plaintiff
was arrested pursuant to an arrest warrant and was
detained for eighteen days without a hearing despite
repeatedly protesting his innocence. 754 F.2d 719, 721-
22 (7th Cir. 1985). This court held that the extended
detention, without an appearance before a judge,
amounted to a deprivation of liberty without due
process of law. *Id.* at 723. In so holding, the court noted
that "the duration of the detention and the burden
placed on state officials in providing procedural safe-
guards are highly relevant to a constitutional examina-
tion of post-arrest detentions." *Id.* at 724. In addressing
the lack of an initial hearing in that case, the court
opined that ensuring first appearances are carried out
in a timely manner places a relatively small burden on

law enforcement officers. *Id.* The court emphasized that during a first appearance, a judge will advise a criminal defendant of several important rights and inform the defendant of the charges in the case. *Id.*; *see also Armstrong*, 152 F.3d at 573 ("Because many of these rights involve the delivery of information—information that allows an arrestee to take appropriate legal action—a first appearance amounts to the established procedure that ensures an arrestee receives this information from a neutral source."). Although the court held that the eighteen-day detention at issue in that case violated due process, it did not attempt to delineate what would constitute a timely initial hearing:

> Our holding today is limited to the extreme circumstances of this case. To specify after what period of time a given detention not accompanied by a first appearance becomes constitutionally infirm, or to outline which of the various elements of a first appearance are minimally necessary to satisfy the due process requirement would amount to inappropriate judicial legislation.

*Coleman*, 754 F.2d at 725. The court noted that it was clear that the plaintiff in that case had not received any of the procedural protections afforded by the intervention of a judicial officer despite his repeated requests for a court appearance. *Id.*

Courts addressing similar unconstitutional detention claims have reached differing conclusions depending on the length of and circumstances surrounding the particular detention. In *Armstrong*, we held that a fifty-

seven-day detention without an appearance before a judge violated due process. *Armstrong*, 152 F.3d at 576. In that case, we emphasized that the plaintiff had protested the lack of a prompt appearance, which the court interpreted as a demand for his rights. *Id.* at 575. In a case decided six years before *Coleman*, the Supreme Court held that a three-day detention without a hearing or investigation following a mistaken arrest pursuant to a valid criminal warrant did not violate due process. *Baker v. McCollan*, 443 U.S. 137, 145 (1979). In reaching its conclusion the Court stated:

> We may . . . assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law." But we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation. *Id.*

Here, Holloway had an initial hearing in front of a judicial officer within seventy-two hours of his arrest. At the hearing, which was conducted via video conference on Friday October 2, 2009, the court informed Holloway of the probable cause determination that had been completed the previous day, informed him of his rights, and appointed an attorney. Pursuant to

Indiana Code § 35-33-7-3,[1] the court granted the pros-
ecutor additional time to evaluate the case, and
ordered that formal charges be filed in the case before
9:00 AM on Wednesday October 7 or Holloway would
be released. The court also ordered that Holloway be
held without bond until October 7. At 10:31 AM on
October 7, guards released Holloway from his cell
because the prosecutor had not filed any charges against
him. Excluding the intervening Saturday and Sunday,
Holloway was released within seventy-two hours of his
initial hearing. Like in *Baker*, the Sheriff detained
Holloway for only three days without a hearing and
without any further investigation into his case. *See
Baker*, 443 U.S. at 145. Within seventy-two hours,
Holloway appeared in front of a judge, who informed
him of his rights and ordered the prosecutor to act
quickly in filing charges. For the Sheriff to have
released Holloway after this initial hearing would have
required the Sheriff to go against a court order, and this
court has held that "[t]here is no basis for an award of
damages against executive officials whose policy is to
carry out the judge's orders." *See Hernandez v. Sheahan*,
455 F.3d 772, 778 (7th Cir. 2006).

---

[1] This section of the Indiana Code states, "If the prosecuting
attorney states that more time is required to evaluate the case
and determine whether a charge should be filed, or if it is
necessary to transfer the person to another court, then the
court shall recess or continue the initial hearing for up to
seventy-two (72) hours, excluding intervening Saturdays,
Sundays, and legal holidays." Ind. Code § 35-33-7-3(b).

Holloway relies on this court's opinion in *Sivard v. Pulaski County*, 959 F.2d 662 (7th Cir. 1992) to suggest that a detainee cannot be held for more than a few days without being charged with a crime. In *Sivard*, the court held that "the failure of the county to charge a detainee held subject to a warrantless arrest with the commission of any crime" violates the Fourth Amendment. *Id.* at 667-68. There are several reasons why *Sivard* does not apply to the facts of this case. In *Sivard*, the court relied on a Supreme Court opinion holding that an individual subjected to a warrantless arrest must receive a probable cause determination within forty-eight hours of the arrest. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991). The Court did not hold that an individual must be charged with a crime within that same forty-eight hour period. *But see Sivard*, 959 F.2d at 666 ("We read the Court's opinion in *County of Riverside* to state that an unexplained detention of 17 days before being charged with the crime for which the detainee is held is presumptively unconstitutional."). In *Armstrong*, which we decided after *Sivard*, we distinguished between a Fourth Amendment claim and a due process claim, noting that the former governs the period of confinement between an arrest without a warrant and a preliminary hearing at which a determination of probable cause is made, and the latter governs the period of confinement following the initial probable cause determination. *Armstrong*, 152 F.3d at 569. In *Sivard*, the defendant did not receive either a probable cause determination or an initial hearing. *Sivard*, 959 F.2d at 667. Moreover, Holloway acknowledges that the issue in this case is

whether the Sheriff violated due process and not whether the Sheriff violated the Fourth Amendment.

The Sheriff brought Holloway before the court within seventy-two hours of his arrest for an initial hearing, followed the court's order in holding him without bond, and released him promptly when the prosecutor did not file charges within the time permitted by the court. There is no evidence that the Sheriff intended to do anything but follow the court's direction. Ultimately, the Sheriff's conduct did not offend the standards of due process and the circumstances of this case do not shock the conscience.

### 2.   The Sheriff Did Not Act Pursuant to an Unconstitutional Policy or Custom.

Even if Holloway could show that he suffered a constitutional deprivation, the Sheriff would still be entitled to summary judgment because Holloway did not present evidence to establish that the alleged deprivation was a result of an existing policy, rather than an isolated incident. Holloway sued the Sheriff in his official capacity, which is effectively the same as having brought suit against the County of Delaware itself. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). The Supreme Court has held that § 1983 claims may be brought against municipalities and other local governmental entities for actions by its employees only if those actions were taken pursuant to an unconstitutional policy or custom. *Id.* at 694. "[I]n situations that call for procedures, rules or regulations, the failure to

make policy itself may be actionable." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986). Citing *Jones* and *Armstrong*, Holloway asserts that the Sheriff did not have a procedure in place to ensure the release of uncharged inmates.

Holloway's reliance on *Armstrong* is misplaced. In *Armstrong*, we held that a will-call system used by jail officials to bring detainees before the court for an initial hearing amounted to a policy of "deliberate indifference." *Armstrong*, 152 F.3d at 579. Under the will-call system at issue in *Armstrong*, jail officials would place arrestees' names on a list and then wait for the court to call each arrestee for an initial hearing. *Id.* at 577-78. There was no additional policy in place for jail officials to identify detainees without court dates or to ensure that detainees did not wait too long for a hearing. *Id.* at 578. The plaintiff in that case argued that the will-call policy represented a conscious choice not to have a policy for bringing individuals before the court. *Id.*

There is no evidence in this case that the Sheriff acted pursuant to a policy similar to the one in *Armstrong* or that there was no policy in place to ensure the release of detainees being held without justification. Instead, the undisputed evidence shows that the Sheriff brought Holloway before the court for an initial hearing and released him as soon as the court's order allowed. The fact that Holloway was released promptly after the deadline set by the court demonstrates that the Sheriff paid attention to which detainees should be held and which

detainees should be released. Holloway cannot demonstrate that the Sheriff's actions violated due process or that the Sheriff acted pursuant to an unconstitutional policy or custom.

## B. Claims Against the Medical Staff

Holloway also argues that Dr. Al-Shami, Nurse St. Myer, and Nurse Hamilton violated his constitutional rights by acting with deliberate indifference to his serious medical needs and that the district court erred in granting summary judgment in their favor. He contends that the medical defendants followed a jail policy against the administration of narcotics and did not provide Holloway with the individualized treatment he needed for his pain. The district court concluded that Dr. Al-Shami's decision to prescribe other painkillers in lieu of Oxycontin and the nurses' deference to Dr. Al-Shami's medical opinion did not amount to a constitutional violation. Because Holloway did not provide sufficient evidence to support an inference that either Dr. Al-Shami or the nurses acted with deliberate indifference, we agree with the district court's conclusion.

The Supreme Court has interpreted the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated by the Fourteenth Amendment, to impose a duty on states "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate this proscription when they act with deliberate indifference to

the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To succeed on a deliberate indifference claim, a plaintiff must (1) demonstrate that his medical condition is "objectively, sufficiently serious," and (2) demonstrate that the defendant acted with a "sufficiently culpable state of mind." *Id.* at 834 (internal quotation marks omitted). Here, Holloway presented evidence adequate to support a finding that he has a serious medical condition, and the defendants do not argue otherwise. The issue then is whether Holloway presented sufficient evidence of deliberate indifference to survive a motion for summary judgment.

### 1.  Dr. Al-Shami

For the duration of Holloway's detention in the Delaware County Jail, Dr. Al-Shami acted as Holloway's primary care physician. After reviewing the information communicated to him by Nurse St. Myer on the day Holloway's detention began, Dr. Al-Shami prescribed medication to treat Holloway's Klippel-Trenauney Syndrome and other illnesses. Although Holloway took large doses of Oxycontin for pain prior to his detention, Dr. Al-Shami did not believe narcotic pain medication was necessary to treat the chronic pain and instead prescribed Ibuprofen and Extra Strength Tylenol for Holloway's pain management. Because he was not prescribing Oxycontin, Dr. Al-Shami also prescribed three different drugs to treat narcotic withdrawal. With the exception of the Oxycontin, Dr. Al-Shami prescribed each of the other medications Holloway had taken prior

to his detention. Holloway argues that Dr. Al-Shami acted with deliberate indifference in not prescribing Oxycontin to manage his pain during the detention. He contends that the non-narcotic pain medications were not an effective substitute and that he was in pain for the duration of his detention.

To demonstrate that a defendant acted with a "sufficiently culpable state of mind," a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). This subjective standard requires more than negligence and it approaches intentional wrongdoing. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness. *Farmer*, 511 U.S. at 837.

Surely Holloway would have preferred to have been treated by a doctor who would have prescribed Oxycontin to treat his chronic pain rather than the non-narcotic substitutes, but a prisoner is not entitled to receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Instead, prisoners are entitled only to "adequate medical care." *Johnson*, 433 F.3d at 1013. "There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is "such

a substantial departure from accepted professional judg-ment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

There is no evidence that Dr. Al-Shami intended to cause Holloway pain or that he knew the Ibuprofen and Extra Strength Tylenol would be insufficient to alleviate Holloway's symptoms. Moreover, Holloway did not present any evidence to show that Dr. Al-Shami's decision not to prescribe Oxycontin was a substantial departure from accepted professional standards. Instead, Holloway argues that Dr. Al-Shami diverted from Holloway's own doctor's opinion that he needed Oxycontin to treat his chronic pain and that his decision not to prescribe the Oxycontin was based on his own personal belief rather than medical judgment. Holloway contends that Dr. Al-Shami told him, "I don't believe in prescribing Oxycontin for pain management." Even assuming that Dr. Al-Shami made this statement, Holloway does not offer evidence to show that Dr. Al-Shami's belief is based on personal rather than medical reasons. Nor does Holloway show this belief represents such a sub-stantial departure from accepted professional standards that it is reasonable to infer that Dr. Al-Shami did not base his decision on a medical judgment.

Holloway cites *Ralston v. McGovern*, 167 F.3d 1160 (7th Cir. 1999), in support of his contention that Dr. Al-Shami's deliberate indifference stemmed from his decision not to defer to Holloway's physician's orders, but he misinter-

prets this court's reasoning in that case. In *Ralston*, we held that a prison guard's refusal to give an inmate his prescribed medication after the inmate complained that he could not swallow and that he was spitting up blood constitutes deliberate indifference. *Ralston*, 167 F.3d at 1161-62. But we did not suggest that prison doctors must always defer to the judgment of a doctor who treated an inmate prior to his detention. Rather, the prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards. *Cf. Arnett v. Webster*, 658 F.3d 742, 753-54 (7th Cir. 2011) (concluding that a prison physician's refusal to prescribe a substitute anti-inflammatory medication in place of an inmate's previously prescribed Enbrel after ten months of complaints could amount to deliberate indifference); *Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004) (concluding that an issue of material fact existed as to deliberate indifference where a prison physician prescribed Tylenol III to an inmate post-surgery without justification and against the surgeon's explicit orders not to do so because of the potential side effects). The court in *Ralston* held only that once a prison physician prescribes medication, a prison guard should not refuse to give the inmate the medication when he needs it. *Ralston*, 167 F.3d at 1161-62.

Dr. Al-Shami considered Holloway's condition and prior treatment before prescribing his medication on the

day Holloway arrived at the jail. For the treatment of Holloway's chronic pain, Dr. Al-Shami prescribed two pain medications as a substitute for Oxycontin, and he prescribed additional medications to prevent Holloway from experiencing narcotic withdrawal symptoms. The two pain medications served the same purpose as Oxycontin, and there is no indication that Dr. Al-Shami prescribed these medications without exercising professional judgment. *See Arnett*, 658 F.3d at 754 ("[A] medical professional's actions may reflect deliberate indifference if he 'chooses an easier and less efficacious treatment without exercising his professional judgment.'" (quoting *McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010))). The only time Holloway reported any pain to Dr. Al-Shami was when Dr. Al-Shami visited him in the jail on October 6, the day before he was released. At that point, Holloway reported that he was experiencing pain in his leg and Dr. Al-Shami responded by ordering a test to check the clotting of Holloway's blood. With Holloway's release imminent, there was no display of deliberate indifference by Dr. Al-Shami between the time of Holloway's complaint and the time of his release.

Although "[a] prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating an inmate's condition," *see Arnett*, 658 F.3d at 754, Holloway did not offer any evidence that Dr. Al-Shami knew before October 6 that the Ibuprofen and Extra Strength Tylenol were not alleviating Holloway's pain. In his brief, Holloway cites to an affidavit he submitted in the district court in

which he stated, "I was in severe and intense pain every single day that I was in the Delaware County Jail and my pain was demonstrable because I was doubled over, I simply laid on the floor or mat, I constantly complained to guards and nurses about how much pain I was in, and I could not take Tylenol because it upset my stomach." Holloway Aff. at 2. He also stated, "[e]very time I saw a physician or nurse at the Delaware County Jail, I complained of my chronic pain and explained how intense and severe the pain was." *Id.* Even if the knowledge of the guards and nurses could be imputed to Dr. Al-Shami, this affidavit conflicts with Holloway's earlier deposition in which he testified that he stayed quiet and did not complain to the nurses about his pain. This court has held that a party cannot "create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996). Holloway's deposition testimony was not ambiguous or confusing, and thus, Holloway cannot submit an affidavit contradicting that testimony to create an issue of fact at the summary judgment stage. *Id.* at 292.

No reasonable jury could conclude that a physician who prescribed an alternative pain medication, who prescribed additional medications to prevent withdrawal symptoms, and who responded to Holloway's only report of pain in his leg by ordering a test to check the clotting of his blood acted with deliberate indifference to Holloway's serious medical condition. Accordingly, we reject Holloway's arguments and hold that the

district court's judgment in favor of Dr. Al-Shami was proper.

###   2.   Nurse St. Myer and Nurse Hamilton

In addition to his claim against Dr. Al-Shami, Holloway asserts that his attending nurses made the decision not to administer narcotic pain medication based on a standing rule that narcotics are not allowed in the jail. He contends that by following Dr. Al-Shami's instructions and not giving him Oxycontin, the nurses acted with deliberate indifference to his serious medical needs. In granting summary judgment to the nurses, the district court concluded that the nurses' deference to Dr. Al-Shami's medical opinion that non-narcotic pain medication could be substituted for Oxycontin did not amount to deliberate indifference.

As a matter of professional conduct, nurses may generally defer to instructions given by physicians, "but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). A nurse may therefore act with deliberate indifference if he or she "ignore[s] obvious risks to an inmate's health" in following a physician's orders. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012). Here, Nurse St. Myer and Nurse Hamilton gave Holloway his medication as prescribed by Dr. Al-Shami at the times they were on duty at the jail. There is no evidence that either nurse should have known from the circumstances that giving Holloway Ibuprofen

and Extra Strength Tylenol, as prescribed by Dr. Al-Shami, put his health at risk. Moreover, the nurses did not have the authority to prescribe medication on their own.

At his deposition, the attorney representing Dr. Al-Shami and the nurses asked Holloway, "did you ever make a complaint to one of the nurses or say, hey, I need help, and they didn't respond to you at all?" Dkt. 20 at 38-39. Holloway responded that he once woke up and complained that his heart was racing and felt that he was "kind of shrugged off," but other than that he "tried to be as nonconfrontational" as he could. *Id.* In response to a follow-up question asking whether he stayed pretty quiet, he said "[o]h yeah. Completely." *Id.* at 39. As noted above, this testimony conflicts with Holloway's later affidavit and his assertion on appeal that he complained constantly to guards and nurses about how much pain he was experiencing. Holloway cannot create an issue of fact that the nurses should have known about his pain by submitting an affidavit that conflicts with his earlier deposition testimony. *See Buckner*, 75 F.3d at 292. The only statement related to Holloway's pain that did not conflict with his earlier deposition testimony was that he laid on the floor while he was detained. Holloway does not explain why his position on the floor should have made it obvious to his attending nurses that not supplying him with Oxycontin created a risk to his health.

Dr. Al-Shami did not act with deliberate indifference in deciding not to prescribe Oxycontin, and the nurses did not act with deliberate indifference in

following Dr. Al-Shami's orders: no evidence suggests that the nurses knew or should have known that Holloway's health was at risk because he was not taking Oxycontin. Nurse St. Myer and Nurse Hamilton are entitled to judgment as a matter of law.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.