NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted July 16, 2021[*]
Decided July 19, 2021

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 20-2908

| | |
|---|---|
| JEFFREY D. LEISER, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 18-cv-277-slc |
| KARL HOFFMANN, et al., *Defendants-Appellees*. | Stephen L. Crocker, *Magistrate Judge*. |

**O R D E R**

Jeffrey Leiser filed a federal lawsuit claiming that, between 2016 and 2018, medical care providers at New Lisbon Correctional Institution in Wisconsin were deliberately indifferent to his chronic back pain and chest pains, violating his Eighth Amendment rights. *See* 42 U.S.C. § 1983. The district court entered summary judgment for the defendants, concluding that no reasonable jury could find that any defendant

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

showed deliberate indifference. Leiser appeals, but we agree with the district court that he did not raise a genuine issue of material fact, and so we affirm.

Because Leiser appeals the entry of summary judgment, we recount the record in the light most favorable to him. *See Woodring v. Jackson Cty.*, 986 F.3d 979, 984 (7th Cir. 2021). Since at least 2011, Leiser has suffered from a degenerative disc disease causing chronic back pain. In this case, Leiser's complaints about his medical treatment began on November 24, 2016, when he reported severe back pain to a nurse, Toni Johnson. After examining him, Johnson noted that he said his pain was "12/10" and that he could not find a comfortable position. She also observed that he was alert and oriented, he had no deformities or swelling, he leaned forward "very easily, with no grimacing or guarded movements," and he sat back without difficulty. Further, staff in Leiser's housing unit informed Johnson that Leiser had used the stairs frequently that day. Johnson determined that she did not need to notify the on-call doctor and that Lesier should continue his medication (Tylenol), apply ice and heat to his back, and use a cane, which she fitted him for that day. She also scheduled a nurse visit for the next day.

At that visit, Leiser reported continuing pain to nurse Koreen Frisk. Frisk contacted the on-call doctor, a non-defendant, who ordered a transcutaneous electrical nerve stimulation (TENS) unit, ibuprofen, a topical pain-relief cream, and a warm compress, as well as an appointment with a doctor for the next week. Leiser told Frisk that ibuprofen and the cream would be ineffective for his kind of pain.

Leiser next saw Dr. Karl Hoffmann. Suspecting that Leiser's disc disease was flaring up, Dr. Hoffmann referred Leiser for an MRI and a consultation with a neurosurgeon. He also prescribed tramadol, a narcotic. Concerned about the addictive effects of narcotics, which he believed were ill-suited for chronic pain, Dr. Hoffmann made the prescription short-term (three weeks) and declined to renew it, despite Leiser's continuing pain. Leiser's MRI showed severe issues, but the neurosurgeon concluded that, although Leiser needed surgery, it was not feasible because he was severely obese. Leiser told Dr. Hoffmann that his pain prevented him from exercising, so the doctor decided to prescribe tramadol again while Leiser tried to lose weight.

About a year later, Dr. Hoffmann discontinued the tramadol prescription after receiving a conduct report that Leiser was suspected of "cheeking" a pill—putting it in his mouth without swallowing it. (The suspicion could not be confirmed because Leiser was uncooperative, the report said.) The next day, Leiser complained to a nurse, Nicole Krahenbuhl, of withdrawal symptoms; he said he had chills, could not eat, was

sweating, and had a sharp pain in his chest. Krahenbuhl consulted with the on-call doctor, who ordered naproxen (a non-narcotic pain reliever) and increased Tylenol.

Leiser sent a health services request to Jamie Barker, the Health Services Manager, reporting that he was suffering withdrawal symptoms, including chest pain, because his tramadol prescription was discontinued. The request was not routed to Barker; rather, a nurse triaged it and responded within 24 hours that the prescription would not be renewed. Barker does not recall ever seeing the complaint.

Leiser also had heart problems. After complaining of chest pains on March 1, 2017, he had exploratory heart surgery (cardiac catheterization) followed by an angioplasty and stenting of two narrowed vessels on April 20. The surgeon prescribed, among other medications, clopidogrel, to help with blood flow. Leiser did not receive those medications immediately, as intended. According to Krahenbuhl, the order likely was not marked "STAT," and so it was transcribed on a non-emergency basis. Leiser says that when he returned from surgery (that same day) Krahenbuhl said she did not know anything about his medications. Three days later, Leiser told Dr. Hoffmann that he had not received any post-surgery medications. Dr. Hoffmann ordered, and Leiser received, clopidogrel that day. After Leiser reported chest pains throughout the week, Dr. Hoffmann followed up with the heart surgeon, who determined that Leiser's delay in taking clopidogrel warranted another cardiac catheterization. The next day, Leiser had the procedure, which showed no further heart problems.

Leiser filed this lawsuit in April 2018. The district court granted him leave to proceed on Eighth Amendment claims based on: (1) Johnson's and Frisk's responses to his back pain in November 2016; (2) Dr. Hoffmann's two discontinuations of tramadol; (3) Krahenbuhl's treatment of his withdrawal symptoms and failure to give him clopidogrel after his surgery; and (4) Barker's failure to respond to his health services request. Ultimately, the district court granted summary judgment for all defendants, concluding that the evidence did not permit a reasonable finding that any defendant violated Leiser's constitutional rights.

Leiser appeals. The parties agree that Leiser had serious medical conditions, and so, for his claim to survive summary judgment, he needed evidence that the defendants were deliberately indifferent to those conditions. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[S]howing mere negligence is not enough"; deliberate indifference means that the defendants "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (emphasis in original).

Leiser first asserts that the district court overlooked multiple factual disputes with respect to how Johnson responded to his reports of severe back pain. But none of the disputes he highlights is material to the question of Johnson's state of mind. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). First, there is no dispute that Johnson decided how to treat Leiser's back pain based on her examination of his vital signs, her observations of his physical abilities, and her consideration of his unit staff's reports (which, even if untrue, as Leiser contends, were nonetheless conveyed to Johnson). These undisputed facts show that Johnson exercised her medical judgment, to which we must defer unless her decisions were a "substantial departure from accepted professional judgment, practice, or standards," or there is evidence of ill intent. *Petties*, 836 F.3d at 729 (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). Leiser's disagreement with Johnson's assessment is insufficient to overcome this deference. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Rather, Leiser needed to, but failed to, point to evidence from which a jury could reasonably conclude that no "minimally competent professional" would respond the same way under the circumstances. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

Leiser's arguments about Frisk are similar: He questions the truthfulness of Frisk's declaration, but his accusations do not cast doubt on the fact that Frisk responded to his complaints of ongoing pain by seeking advice from the on-call doctor. That doctor ordered a TENS unit, ibuprofen, muscle rub, a warm compress, and a follow-up appointment. Nurses are entitled to rely on a doctor's instructions unless it is obvious that the doctor's advice will result in harm. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1076 (7th Cir. 2012). To the extent Leiser complains that he told Frisk that some of the treatments would be ineffective, he does not suggest that he told her the basis for his opinion (such as, whether or for how long he had previously tried those treatments). And Leiser did not have the right to direct his own treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015).

As to Leiser's claims against Dr. Hoffmann, Leiser argues that the conservative use of tramadol left him in persistent pain. But doctors are not deliberately indifferent when they are unable to eliminate completely a patient's pain. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). And Dr. Hoffmann's decisions to prescribe tramadol on a short-term basis at first and later to terminate it after reported "cheeking" were both based on concerns about the risks of dependency or abuse, so those decisions are entitled to deference. *See Burton*, 805 F.3d at 786. Leiser contends that his neurosurgeon wanted him to stay on tramadol longer than the initial three-week prescription, but he

has no evidence that the surgeon conveyed that opinion to anyone else. He also insists that the report about his hoarding pills was false and that Dr. Hoffmann should have weaned him off the drug. But Leiser did not provide evidence that Dr. Hoffmann had reason to doubt the report. And Dr. Hoffmann testified that the risks of substance abuse outweighed the risks of withdrawal, again demonstrating his use of medical judgment.

Next, Leiser challenges the entry of summary judgment for Krahenbuhl, the nurse who saw him for withdrawal symptoms and whom he spoke to about medication after surgery. He first argues that when he had withdrawal symptoms including chest pains, she should have sent him to the hospital because his chart showed that he was scheduled for a heart procedure in short order. But Krahenbuhl believed that the discontinuation of his tramadol prescription, not cardiac distress, accounted for his symptoms, and she responded by calling the on-call doctor and following his orders. *See Holloway*, 700 F.3d at 106. As for Krahenbuhl's failure to provide Leiser with clopidogrel after surgery, Leiser has no evidence to contradict the testimony that the delay resulted from improper categorization of the prescription, which might be negligent, but does not support an Eighth Amendment claim. *See Petties*, 836 F.3d at 728.

Finally, the district court correctly entered summary judgment for Barker, the manager of the health services unit, because she did not have any personal knowledge of Leiser's complaint. Leiser contends that Barker should be held responsible anyway, because an unspecified prison policy required her to personally respond and because she is responsible for her staff's training. Even if Leiser had evidence that Barker violated prison policy by delegating her duties, that alone would not establish a constitutional violation. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011). And even if the nurse who responded to the complaint somehow violated his constitutional rights, a "supervisor can be liable only if [s]he wants the unconstitutional or illegal conduct to occur." *Vance v. Rumsfield*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc). And it is undisputed here that Barker was not aware of Leiser's complaint or the response to it.

AFFIRMED